946 A.2d 645

COMMONWEALTH of Pennsylvania, Appellee

v.

Herbert J. BLAKENEY, Appellant.

Supreme Court of Pennsylvania.

Argued Dec. 4, 2006.

Decided May 1, 2008.

512

514

Brian W. Perry, Esq., Nealon, Gover & Perry, Harrisburg, for Herbert J. Blakeney.

Edward Michael Marsico, Jr., Esq., Michael Alan Sprow, Esq., Amy Zapp, Esq., James P. Barker, Dauphin County District Attorney's Office, for Commonwealth of Pennsylvania.

CAPPY, C.J., and CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## OPINION

Chief Justice CASTILLE.

This is a direct appeal from a sentence of death imposed by the Dauphin County Court of Common Pleas on August 8, 2002, following a capital jury trial. Because we find the issues raised by appellant without merit, we affirm the convictions and judgments of sentence.

Sacha Blakeney, the estranged wife of appellant, Herbert Blakeney, lived in an apartment at 63 North 14th Street in Harrisburg with Duana Swanson and their respective children. Responding to a report of a domestic disturbance at the apartment on February 1, 2000, Harrisburg Police found appellant and Sacha engaged in an argument. When appellant would not leave, the police escorted him from the apartment to his place of residence. Later that evening, Sacha left the apartment, leaving behind Swanson, Swanson's thirteen-year-old son, Maurice, and Sacha's two infant children, Basil and Aliya. Appellant later returned to the apartment to

retrieve some clothing. Appellant also repeatedly telephoned the apartment asking to speak with Sacha. Fearful of further confrontations or telephone calls, Swanson had a friend, Garth George, stay with her until Sacha returned. Swanson also spoke with Sacha and informed her that appellant had been to the apartment.

While out buying beer, George encountered appellant, who told George "he was getting ready to do something" and did not want George to get involved. Notes of Testimony ("N.T."), 8/6/02, at 599, 602. George rejoined Swanson at the apartment and both soon discovered that the telephone lines had been cut, which appellant admitted to at trial. Leaving George with the children, Swanson and Maurice went to a nearby phone booth to call the police, who said that they would "keep an eye on the place." *Id.* at 550. Sometime thereafter, George left the apartment, and as he left, Swanson asked him to call the police again.

Later that night, in the early morning hours of February 2, 2000, appellant entered the apartment with a butcher knife and confronted Swanson and the children in a bedroom. Appellant jumped on the bed where Swanson and the children were gathered, grabbed Swanson by the arm, and dragged her from the bed. Maurice ran from the room and was immediately pursued by appellant, who had released Swanson to give chase. When Maurice reached the rear door he opened it to find Harrisburg Police Officer William Vernouski standing in the threshold with his gun drawn. Officer Vernouski, who was responding to a pending call, had arrived at the residence and approached the rear door after hearing a woman inside screaming for help.

At that point, appellant turned towards Swanson and stabbed her in the chest with his butcher knife. The two began to struggle, causing Swanson additional injuries to her hands. Appellant continued to try to stab Swanson while Officer Vernouski repeatedly told him to drop the knife. Appellant and Swanson fell to the floor. Appellant leaned over Swanson with his knife and choked her until she lost consciousness. Appellant walked away from Swanson and re-

peatedly walked in and out of the bedroom while making stabbing motions towards Officer Vernouski and shouting, "Shoot me, shoot me."

Appellant then reached toward the children, who had been asleep on the bed, picked up Basil, Sacha's 14–month–old son (not fathered by appellant), and held the child in his left arm while holding the knife in his right hand with the blade to Basil's throat. Officer Vernouski, who was now accompanied by other police officers, attempted to reason with appellant, but appellant refused to put the infant down and walked into a rear stairwell. Appellant then cut Basil's throat with the butcher knife in a back-and-forth sawing motion, cutting the child's neck down to the bone and producing a gaping stab wound. Appellant relinquished control of the child only after Officer Vernouski shot him three times. The officers attempted to revive the infant, but were unsuccessful. Basil was rushed to the hospital where it was determined that he died from the wounds inflicted by appellant. The forensic pathologist who performed the autopsy of Basil described the wound as "a huge stab wound in the neck" made by "multiple cuts . . . down into the bone," and that "[i]t appeared [appellant] was trying to cut the poor child's neck off." N.T., 8/6/02, at 649–51.

At trial, where appellant requested and was permitted to represent himself, the foregoing facts were presented. Officer Vernouski described the events recounted above. Regarding the murder of the child, Officer Vernouski testified:

[Appellant] is now, he is laying back on the stairwell, and he is still holding the baby. The baby's head is covering part of his head and most of the baby's body is on his torso and I seen him with the knife and I could see the baby. There is a lot of blood right here and he is cutting the baby and this is instantly.

N.T., 8/6/02, at 682. Harrisburg Police Officers David Kyle and Charles Painter also testified. Although Officer Painter saw appellant hold the knife to Basil's throat and was immediately behind Officer Vernouski when appellant cut the infant's

neck, neither Officer Painter nor Kyle saw the murderous act itself.

The jury returned a verdict of guilty for the first-degree murder of Basil Blakeney, as well as the attempted murder and aggravated assault of Duana Swanson. At the sentencing phase, the Commonwealth presented three aggravating circumstances pursuant to 42 Pa.C.S. § 9711(d)(3), (7), and (16).[1] Appellant elected not to pursue any mitigating circumstances. On October 17, 2002, the jury found two aggravating circumstances, Sections 9711(d)(3) and (16), and no mitigating circumstances, and, because there were no mitigators, returned a sentence of death as mandated by law. *See* 42 Pa.C.S. § 9711(c)(iv). The trial court later formally imposed the sentence of death, as well as a lesser concurrent sentence of 20–to–40 years' incarceration for the attempted murder of Duana Swanson.

Appellant, who is now represented by counsel, raises six issues on appeal, five addressing the guilt phase of his trial and one regarding the penalty phase.[2]

## I. Sufficiency of the Evidence

Appellant first claims that the evidence was insufficient to support his convictions for first-degree murder and attempted murder.[3] With respect to his conviction for the first-degree murder of Basil Blakeney, appellant states that the Commonwealth did not demonstrate that he killed Basil and

---

1. The three aggravating circumstances were as follows: (d)(3) the victim was being held by the defendant for ransom or reward, or as a shield or hostage; (d)(7) in the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense; and (d)(16) the victim was a child under 12 years of age. 42 Pa.C.S. § 9711.

2. We have reordered appellant's claims for the sake of clarity.

3. In all death penalty direct appeals, whether or not the appellant specifically raises the issue, this Court reviews the evidence to ensure that it is sufficient to support the first-degree murder conviction. *Commonwealth v. May*, 584 Pa. 640, 887 A.2d 750, 753 (2005) (citing *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983) and *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385, 402 (2003), *cert. denied*, 543 U.S. 822, 125 S.Ct. 30, 160 L.Ed.2d 31 (2004)).

that, even if it did, it was insufficient to show that he did so with the specific intent to kill. As for the attempted murder of Duana Swanson, appellant claims that, while he admittedly was in an altercation with Swanson, he did not take a substantial step towards killing her. Although he may have intended to cause her bodily harm, appellant contends, the Commonwealth failed to prove that he had the specific intent to kill her. Appellant does not develop either argument in any meaningful fashion. He does not discuss the evidence at trial, or tie it to any theory of insufficiency.

The Commonwealth responds that the evidence was sufficient to prove beyond a reasonable doubt that appellant acted with specific intent to kill both when he murdered Basil and when he attempted to murder Swanson. Additionally, the Commonwealth states that no evidence of legal justification for appellant's actions was presented at trial.

In its Pa.R.A.P.1925(a) opinion, the trial court determined that the evidence satisfied the elements of murder in the first degree as to Basil. Specifically, the evidence demonstrated that: (1) Basil Blakeney was a fourteen-month-old child who was unlawfully killed; (2) appellant was responsible for the killing of Basil; and (3) the jury could infer specific intent from appellant's use of a deadly weapon upon a vital part of Basil's body. The trial court also found the evidence sufficient to prove the attempted murder of Duana Swanson because the jury could find specific intent to kill from appellant's use of a deadly weapon upon a vital part of Swanson's body, and thereby took a substantial step towards the goal of killing her.

■■■ Evidence presented at trial is sufficient when, viewed in the light most favorable to the Commonwealth as verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to establish all elements of the offense beyond a reasonable doubt. *Commonwealth v. Edwards,* 588 Pa. 151, 903 A.2d 1139, 1146 (2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 2030, 167 L.Ed.2d 772 (2007) (citing *Commonwealth v. Bridges,* 563 Pa. 1, 757 A.2d 859, 864 (2000)). In the case of first-degree murder, a person is guilty

when the Commonwealth proves that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. 18 Pa.C.S. § 2502(d); *Commonwealth v. Spotz,* 563 Pa. 269, 759 A.2d 1280, 1283 (2000), *cert. denied,* 534 U.S. 1104, 122 S.Ct. 902, 151 L.Ed.2d 871 (2002). An intentional killing is a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). The Commonwealth may prove that a killing was intentional solely through circumstantial evidence. The finder of fact may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Rivera,* 565 Pa. 289, 773 A.2d 131, 135 (2001), *cert. denied,* 535 U.S. 955, 122 S.Ct. 1360, 152 L.Ed.2d 355 (2002). A conviction for attempted murder requires the Commonwealth to prove beyond a reasonable doubt that the defendant had the specific intent to kill and took a substantial step towards that goal. 18 Pa.C.S. §§ 901, 2502.

██ The evidence adduced at trial overwhelming proved appellants guilt of both crimes. On February 1, 2000, police escorted appellant from his estranged wife Sacha's home following a domestic dispute. Throughout the remainder of the day appellant made numerous visits and placed repeated phone calls to the residence seeking to speak with his wife. Appellant cut the phone lines and warned Garth George to stay away from the residence because he [appellant] was getting ready to do something. In the early hours of February 2, 2000, appellant broke into the home where Sacha and Duana Swanson lived with their young children and attacked Swanson with a butcher knife, stabbing her in the chest, a vital part of the body. Appellant did so in full view of, and notwithstanding the presence of, Officer Vernouski, who had his gun drawn. Appellant then made stabbing gestures at the police officers and asked them to shoot him. Showing total disregard for the child's safety, appellant picked Basil up from the bed where the helpless baby had been sleeping. Appellant held his knife to Basils throat, and cut it several times in a

back-and-forth sawing motion. In murdering the infant, appellant nearly decapitated him. These actions were witnessed by a number of police officers, most notably Officer Vernouski, who shot appellant three times in a futile attempt to prevent him from continuing to cut the baby's throat.

The foregoing evidence was overwhelmingly sufficient to support the jury's finding that appellant committed the first-degree murder of Basil Blakeney. Cutting the phone lines and breaking into the residence armed with a knife established that appellant planned to commit a violent crime. Appellant's cold-hearted conduct in repeatedly cutting the neck of Basil, a vital part of the baby's body, with a deadly weapon, clearly established his specific intent to kill. *See Rivera*, 773 A.2d at 135.

The foregoing evidence was also sufficient to support the jury's finding that appellant was guilty of the attempted murder of Duana Swanson. Appellant entered Swanson's residence without permission, dragged her out of bed by her arm, stabbed her in the chest with a butcher knife, and choked her until she lost consciousness. The jury could readily infer specific intent to kill from appellant's deliberate act of stabbing Swanson in the chest. That inference is made stronger by appellant's repeated attempts to stab her again, and by choking her until she was unconscious.

## II. Weight of the Evidence

Appellant next claims that the verdict was against the weight of the evidence. In forwarding this claim, appellant contends the following: (1) the jury improperly disregarded that appellant's alcohol use impaired his faculties; (2) the blood evidence presented at trial did not prove that appellant killed Basil; and (3) the police officers' testimony was contradictory.

A verdict is against the weight of the evidence "only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. Cousar*, 593 Pa. 204, 928 A.2d 1025, 1036 (2007). A weight of the evidence claim is primarily directed to the discretion of the

judge who presided at trial, who only possesses "narrow authority" to upset a jury verdict on a weight of the evidence claim. *Edwards*, 903 A.2d at 1148. Assessing the credibility of witnesses at trial is within the sole discretion of the fact-finder. *See id.* A trial judge cannot grant a new trial merely because of some conflict in testimony or because the judge would reach a different conclusion on the same facts, but should only do so in extraordinary circumstances, "when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Armbruster v. Horowitz*, 572 Pa. 1, 813 A.2d 698, 703 (2002) (quoting *Commonwealth v. Brown*, 538 Pa. 410, 648 A.2d 1177, 1189 (1994)) (quotation marks and emphasis omitted). On review, an appellate court determines whether the trial court abused its discretion based upon review of the record; its role is not to consider the underlying question in the first instance. *Id.*

In forwarding his weight of the evidence claim, appellant first argues that his alcohol use so undermined his faculties that the jury could not have reasonably concluded that he was guilty of first-degree murder. Appellant cites 18 Pa.C.S. § 308 and *Commonwealth v. Fairell*, 476 Pa. 128, 381 A.2d 1258 (1977) to support his claim.

The Commonwealth counters that nothing in the record supports appellant's claim of voluntary intoxication; to the contrary, the evidence clearly indicated that appellant was not impaired on the night in question. Indeed, the Commonwealth asserts, all of the defense witnesses called by appellant testified that he was not intoxicated.

Citing *Fairell* in its opinion, the trial court recognized that evidence of intoxication may negate the intent necessary for first-degree murder, and that appellant had presented intoxication evidence at trial to indicate he had been drinking on the night of the murder. Noting that the jury found that appellant had the specific intent to commit murder, the trial court rejected appellant's intoxication/weight argument, reasoning that the jury had exercised its discretion to disbelieve the

assertion by appellant that he was intoxicated at the time of the killing.

Evidence of intoxication may be offered by a defendant to reduce murder from a higher degree to a lower degree. 18 Pa.C.S. § 308. Intoxication, however, may only reduce murder to a lower degree if the evidence shows that the defendant was "overwhelmed to the point of losing his faculties and sensibilities." *Commonwealth v. Breakiron*, 524 Pa. 282, 571 A.2d 1035, 1041 (1990) (citation omitted), *cert. denied*, 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990). The value of such evidence is generally for the finder of fact, who is free to believe or disbelieve any, all, or none of the testimony addressing intoxication. *Commonwealth v. Fletcher*, 580 Pa. 403, 861 A.2d 898, 908 (2004), *cert. denied*, 547 U.S. 1041, 126 S.Ct. 1617, 164 L.Ed.2d 336 (2006).

At trial, appellant offered the testimony of three acquaintances whom he was with on the night of the murder to prove that he was intoxicated when he committed his crimes. Although the three acquaintances testified that appellant had been drinking alcohol, none described appellant as intoxicated. In fact, one of the defense witnesses did not testify to his alleged intoxication at all, another was unsure whether appellant was intoxicated, and the third responded "no," when asked if appellant appeared to be intoxicated. *See* N.T., 8/7/02, at 813, 819, 821–22. It was the prerogative of the jury to believe or not believe appellant's claim that he was so intoxicated as to be "overwhelmed to the point of losing his faculties and sensibilities." *See Breakiron*, 571 A.2d at 1041. The trial court did not abuse its discretion in deferring to the jury on this weight claim.

Next, appellant argues that the blood evidence presented at trial did not prove that he killed Basil and that failure of proof renders the jury's murder verdict against the weight of the evidence. Appellant argues that, because only a limited amount of the baby's blood was found on his clothing, and none was found on his boots, he could not have murdered

Basil, because if he had, there would have been more blood found on his person.

The Commonwealth responds that blood was found on the clothing of appellant and the fact that it may not have been a substantial amount, of course, in no way exonerates appellant. The fact that any blood was found on appellant demonstrates that he was in close proximity to Basil when the child was killed and this evidence corroborates the direct eyewitness testimony of Officer Vernouski that appellant cut the baby's throat.

The trial court reasonably rejected appellant's blood evidence argument based on the blood found on appellant coupled with the eyewitness testimony of Officer Vernouski. The Court did not abuse its discretion in so ruling.

Officer Vernouski witnessed appellant grab Basil, hold the butcher knife to the child's throat, and slice his throat in a back-and-forth sawing motion. Additionally, the blood evidence here corroborated the eyewitness testimony of Officer Vernouski. The evidence was uncontradicted that Basil was murdered; the infant's blood was on appellant; Officer Vernouski saw him cut the infant's throat. The absence of additional blood on appellant does not render this verdict against the weight of the evidence.

Finally, appellant contends that the verdict is against the weight of the evidence because the police testimony was contradictory. Without elaboration, appellant states that the officers contradicted one another on the stand "as to how the killing occurred," and that the contradictions could not have allowed a reasonable jury to convict appellant. With the exception of some minor confusion surrounding which officer was handling the mortally wounded child after appellant had been shot—which would be understandable given the shocking circumstances, and which does not call into question appellant's guilt—the testimony of Officers Vernouski, Kyle, and Painter was minimally contradictory. Because appellant does not develop this argument further, it fails.

### III. Self–Representation

■ Appellant next claims that the trial court erred in granting his request to represent himself at trial. Specifically, appellant contends that the trial court should have: (1) conducted a more thorough colloquy as to appellant's decision to represent himself; and (2) responded to appellant's alleged second thoughts about proceeding *pro se* on the first day of trial with an additional colloquy to confirm that he still wished to proceed *pro se*. In forwarding this claim, appellant cites *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) and *Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326 (1995) for the Sixth Amendment concerns implicated by proceeding *pro se*.

The Commonwealth responds that the trial court's colloquy was sufficient and that, because a waiver of counsel had already been made and accepted by the court, any subsequent attempt to dissuade appellant from self-representation, or to force a lawyer upon him, would have infringed upon his Sixth Amendment right to self-representation.

The trial court noted in its opinion that the colloquy it conducted fully satisfied the mandate of advising appellant of the consequences of self-representation as required by law. Additionally, the trial court found that a further colloquy was unnecessary because appellant's alleged "equivocation" on the first day of trial was "merely an attempt to be held to a lesser standard of accountability than a licensed attorney." Trial Ct. Op. at 24. Accordingly, the trial court concluded that appellant knowingly, intelligently, and voluntarily waived his right to court-appointed counsel, and validly exercised his right of self-representation.

■ The right to self-representation is necessarily implied within the structure of the Sixth Amendment of the U.S. Constitution. *Faretta*, 422 U.S. at 819–20, 95 S.Ct. 2525. Before a defendant will be permitted to proceed *pro se*, the defendant must knowingly, voluntarily, and intelligently waive his Sixth Amendment right to counsel. *Id.* at 835, 95 S.Ct.

2525. To ensure a proper waiver, the trial court must conduct a "probing colloquy," as was described by this Court in *Starr*:

> The "probing colloquy" standard requires Pennsylvania trial courts to make a searching and formal inquiry into the questions of (1) whether the defendant is aware of his right to counsel or not and (2) whether the defendant is aware of the consequences of waiving that right or not. Specifically, the court must inquire whether or not: (1) the defendant understands that he has the right to be represented by counsel, and the right to have free counsel appointed if he is indigent; (2) the defendant understands the nature of the charges against him and the elements of each of those charges; (3) the defendant is aware of the permissible range of sentences and/or fines for the offenses charged; (4) the defendant understands that if he waives the right to counsel he will still be bound by all the normal rules of procedure and that counsel would be familiar with these rules; (5)[the] defendant understands that there are possible defenses to these charges which counsel might be aware of, and if these defenses are not raised at trial, they may be lost permanently; and (6) the defendant understands that, in addition to defenses, the defendant has many rights that, if not timely asserted, may be lost permanently; and that if errors occur and are not timely objected to, or otherwise timely raised by the defendant, the objection to these errors may be lost permanently.

664 A.2d at 1335 (citations omitted). If the trial court finds that the defendant's waiver is not knowing, voluntary, and intelligent after a probing colloquy, the court may prevent the defendant from proceeding *pro se. Id.*

The trial court here conducted an extensive waiver colloquy on January 29, 2001, which covers some nineteen pages of transcript. The colloquy covered all six areas contemplated in *Starr*. The colloquy confirmed that appellant, among other things, wished to represent himself, was aware that he had the right to an attorney, was aware of the elements of the charges against him and that the Commonwealth was seeking the death penalty, understood that waiver of court-appointed

counsel meant a waiver of the attorney's expertise and experience, understood the meaning of a "knowing and voluntary" waiver of court-appointed counsel, and knew that he would be held to the same standards as a licensed attorney.[4] Before accepting the waiver, the court also encouraged appellant to reconsider his request for self-representation. After accepting the waiver, the court directed that appellant's two experienced appointed attorneys would serve as his stand-by counsel.

In now asserting that the colloquy was insufficient, appellant cites *Faretta* and *Starr*, but does not identify, let alone elaborate upon, any information or right that the court failed to explain to him. On this record then, any claim that the court erred in its initial granting of appellant's wish to represent himself fails.

The gravamen of appellant's present complaint actually concerns the first day of trial. On that day, appellant made the following statement: "First of all, I would like to indicate

4. Addressing the standards appellant would be held to, the colloquy was as follows:

Court: Now, Mr. Blakeney, do you understand that you would be bound by all of the normal rules and procedures during the pre-trial and post-trial proceedings. . . . Do you understand that?
Appellant: Yes.
Court: You would be given no deference because you have no legal training. That means we wouldn't say well, we are going to not hold you to the same rules and requirements of Mr. Muller and Mr. Helm [stand-by counsel] because you have no legal training. Do you understand that?
Appellant: Yes.

\* \* \* \*

Court:. . . . And you understand that you would be held to the same standards as attorneys would by meeting time periods where these documents have to be filed. Do you understand that?
Appellant: Yes.
Court: As I have just said, counsel, that is your attorneys, have knowledge of the areas in representation that is required, particularly pre-trial proceedings and Court proceedings.

\* \* \* \*

Do you understand all of those rights that you would be giving up essentially by representing yourself?
Appellant: Yes.
N.T., 1/29/01, at 15–17

the handicap of being *pro se*, not being held to the level of an attorney, citing *Haines* again, not being held to the same standard of an attorney, *Keller,* [sic] 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652." N.T., 8/1/02, at 8.[5] The trial court responded: "You [appellant] made your choice. The Court told you repeatedly that the Court thought it was in your best interest to be represented by these two highly competent attorneys and after all that you indicated to me that you wanted to represent yourself and we permitted you to do so." *Id.,* at 8–9. Appellant did not object, much less did he indicate any desire to revisit his waiver of counsel.

Appellant now argues that his request for specialized treatment because he was acting *pro se* amounted to "equivocation" concerning representing himself and required the trial court to *sua sponte* conduct an additional colloquy. Appellant cites no authority to support the notion that the court was obliged, on its own, to reopen the self-representation issue. Moreover, the exchange quoted above included no indication that appellant had "second thoughts" about proceeding *pro se.* To the contrary, it appears that appellant was forwarding a lawyerly argument that, while representing himself, he should be held to a lesser standard than an attorney. Thus, appellant's current claim fails as a matter of fact and law: appellant did not seek to revisit his waiver, and there was no requirement that the trial court revisit the waiver *sua sponte.*

## IV. Psychological Evaluation Fees

On July 31, 2002, less than a week before commencement of appellant's trial, appellant filed a *pro se* "Petition for Expert Witness Fee." Appellant stated that he had "expressed a desire" in October of 2000 to have a psychologist testify on his behalf at the penalty phase. Appellant then relayed that his

---

**5.** It appears that appellant was citing solely to *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (*per curiam* ) (*pro se* complaint held to less stringent standards than formal pleadings drafted by lawyer). *Haines* calls for the *pro se* pleadings of an inmate to receive differential treatment, but does not say that a *pro se* defendant is entitled to special treatment at trial. It seems that appellant was attempting to make a legal argument that *Haines* should also apply to *pro se* defendants at trial.

stand-by counsel, the Chief Deputy Public Defender of Dauphin County, had contacted a psychologist who was willing to examine appellant over the weekend in time for the penalty phase, for a fee of $3,000. Appellant requested that the court authorize payment of that fee from public funds. Other than noting his "desire," appellant cited no authority or theory, constitutional or otherwise, in support of the request for funds; nor did he allege any factual circumstances or issues that might require appointment of a mental health expert. The next day, then-President Judge Joseph H. Kleinfelter denied the motion, "but without prejudice of [sic] the Public Defender to retain an expert out of the P.D.'s budget." Apparently, the Public Defender elected not to retain the expert. At the commencement of the penalty phase, after appellant announced that he did not wish to pursue any mitigating circumstances, standby counsel reminded the court of appellant's pre-trial request for funds for a psychological examination. Appellant responded, however, that he "would like to withdraw that motion." N.T., 8/9/02, at 924–25. After further discussion between stand-by counsel and the trial court, appellant again urged the court to "move on." *Id.* at 925–26.

On appeal, appellant now argues that the trial court's denial of his pre-trial request for fees to obtain the services of his chosen psychologist denied him "fundamental due process" under the federal and Pennsylvania Constitutions.[6] Appellant notes that this Court has addressed the question of entitlement to fees for mental health examinations, but in a context involving a capital defendant's future dangerousness. Brief of Appellant, 25–26, citing *Commonwealth v. Fisher*, 572 Pa. 105, 813 A.2d 761 (2002) (Opinion Announcing the Judgment of the Court, or "OAJC"), and *Commonwealth v. Miller*, 560 Pa. 500, 746 A.2d 592 (2000). Appellant also cites *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), which he deems significant for the following passage: "We hold that

6. Although appellant invokes both Constitutions, he acknowledges that the provisions are "substantially coextensive," and thus he does not argue that the state charter should be construed to provide greater protection than its federal equivalent in this instance.

when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue, if the defendant cannot otherwise afford one." 470 U.S. at 74, 105 S.Ct. 1087. Appellant then places heaviest emphasis on Mr. Justice Saylor's Concurring Opinion in *Miller* (which was acknowledged by the *Fisher* OAJC). Appellant quotes the following passage from Justice Saylor's Concurrence:

In those cases where a legitimate component of the defense to the charge of murder or the Commonwealth's effort to obtain a sentence of death lies in demonstrating to the jury a claim concerning the defendant's mental condition, expert psychiatric assistance may be indispensable. In such instances, I believe that it would be an abuse of discretion for the trial court to deny a request for funding, even though the request would not implicate federal constitutional due process concerns as interpreted by [*Commonwealth v. Christy*, 540 Pa. 192, 656 A.2d 877 (1995) (plurality), *cert. denied*, 516 U.S. 872, 116 S.Ct. 194, 133 L.Ed.2d 130 (1995) ]. I would thus enforce as mandatory what the majority posits is permissive so that, as the trial court appropriately ensured in the present case, an indigent defendant is provided core resources necessary to present a full and fair defense in all phases of capital litigation.

*Miller*, 746 A.2d at 605 (Saylor, J., concurring).

Appellant does not suggest here, nor did he suggest below, that he "made a preliminary showing" that his sanity was at issue, as in *Ake*, or even a preliminary showing that some useful mental health mitigation evidence was likely to arise from a psychological examination. Nor has appellant ever suggested that a "legitimate component" of his defense at the penalty phase encompassed his mental condition, such that the view of the *Miller* concurrence is implicated. Instead, appellant's argument is absolutist. Indeed, the core of his argument consists of a simple declaration that: "during the penalty phase of any capital murder trial, psychiatric/psychological assistance is indispensable to determine whether there is any

available mitigation evidence to present," and that such a rule is particularly required when the defendant is representing himself at trial. Brief of Appellant, 27.

 In response, the Commonwealth first argues that appellant waived his claim for funds to retain a psychologist of his choosing when he was permitted to withdraw the motion at the outset of the penalty phase. In the alternative, the Commonwealth argues that, under existing decisional law, a capital defendant is not entitled to state-paid psychiatric assistance to discover, develop or prove mitigation evidence. Citing *Christy,* as well as *Fisher* and *Miller,* the Commonwealth argues that an entitlement to psychiatric fees has been recognized only if the Commonwealth argues future dangerousness as an aggravating circumstance which the defendant would attempt to rebut. The Commonwealth also argues that appellant's reliance on *Ake* is misplaced, as that case concerned entitlement to the assistance of a psychiatrist where the indigent defendant asserts that he was insane at the time of the offense, and not funds to attempt to discover mental health mitigation evidence for the penalty phase of trial.[7]

We will first address the Commonwealth's waiver argument. Although the argument is colorable, we view the pre-trial and post-guilt-phase stages of trial to be sufficiently distinct that we will not hold that appellant waived his broad claim of entitlement to fees to retain a mental health expert to conduct an evaluation with an eye toward the penalty phase, by "withdrawing" the motion at the outset of the penalty phase. Moreover, although appellant cited no authority or theory in support of his pre-trial petition for fees, and did not specifically claim that a due process value was at stake, we deem the petition sufficient to preserve the claim presently forwarded. The pre-trial motion was made in broad terms; the present argument likewise is characterized in the broadest, most absolute terms; the trial court deemed the issue to have been

7. In its opinion, the trial court cited *Fisher* as controlling for the proposition that a capital defendant "is not entitled to state-paid psychiatric assistance to prove mitigating circumstances."

preserved; and the Commonwealth does not dispute that due process was the implicit basis for the broad motion.

Turning to the merits, we perceive no abuse of discretion in the trial court's denying the eve-of-trial request for public funds to retain an expert of the defense's choosing to conduct a psychological examination.[8] The authorities appellant cites do not support the broad argument he makes here. *Ake* recognized two scenarios where state-paid psychiatric assistance for an indigent capital defendant could be required: (1) relating to the guilt phase—"[w]hen the defendant is able to make an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in his defense"; and (2) relating to the penalty phase—"when the State presents psychiatric evidence of the defendant's future dangerousness." *Ake*, 470 U.S. at 82–84, 105 S.Ct. 1087. Appellant cites to the guilt phase rule in *Ake*, which obviously is inapposite. Moreover, the second rule in *Ake* involved rebuttal of psychiatric evidence respecting future dangerousness. Such is not the scenario here.

Of course, the fact that appellant's claim does not fall squarely under *Ake* does not end the due process issue. Nevertheless, this Court's precedent construing *Ake* does not support appellant's broad request. In *Commonwealth v. Appel*, 547 Pa. 171, 689 A.2d 891, 908 (1997), this Court held that, when a defendant demonstrates that his sanity at the time of the offense is to be a significant factor at trial, the state must provide access to competent psychiatric assistance. Because the defendant in *Appel* did not invoke an insanity defense at

8. We emphasize the lateness of appellant's request, and the fact that he sought a certain amount to retain a particular psychologist only because, even if the broad general right appellant advocates—the right of a capital defendant to the assistance of a psychological expert in all capital cases—were accepted, it does not follow that the timing of the request, the amount of money to be paid, and the identity of the expert would be entirely within the capital defendant's control. *See Ake*, 470 U.S. at 83, 105 S.Ct. 1087 (where right of access to psychiatric assistance exists, it does not mean "that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own"; "we leave to the States the decision on how to implement this right.").

trial, *Ake* was deemed inapposite. *Id.* In *Christy, supra,* the plurality recognized the penalty phase, future dangerousness scenario described in *Ake,* and held that a defendant is entitled to state-paid psychiatric assistance only to rebut the Commonwealth's argument of future dangerousness. 656 A.2d at 883. This limited focus was later reaffirmed in *Miller* and *Fisher,* the two Pennsylvania cases discussed by appellant. *See Miller,* 746 A.2d at 600; *Fisher,* 813 A.2d at 765.

The federal circuits are presently divided as to the scope of *Ake's* application at the penalty phase of a capital trial. Some Circuits, such as those referenced by Justice Saylor in his *Miller* Concurrence, have interpreted *Ake* more broadly, requiring access to psychiatric assistance when sanity or some other mental issue is a significant factor at trial or sentencing. *See, e.g., Smith v. Mitchell,* 348 F.3d 177, 207 (6th Cir.2003) (*Ake* requires psychiatric assistance during penalty phase if state presents psychiatric evidence of future dangerousness at penalty phase, or the defendant's sanity was a significant factor at trial); *Clisby v. Jones,* 960 F.2d 925, 928–29 (11th Cir.1992) ("*Ake* requires a state to provide the capital defendant with such access to a competent psychiatrist upon a preliminary showing to the trial court that the defendant's mental status is to be a significant factor at sentencing."). Other Circuits have taken an approach similar to *Christy* and *Miller, i.e.,* limiting state-paid psychiatric assistance to circumstances where the state argues future dangerousness. *See, e.g., James v. Gibson,* 211 F.3d 543, 552 (10th Cir.2000) (psychiatric assistance must be provided at sentencing stage if state presents evidence of defendant's continuing threat to society and defendant establishes that his mental state could be significant mitigating factor); *Goodwin v. Johnson,* 132 F.3d 162, 188–89 (5th Cir.1997) (psychiatric assistance required only when state presents psychiatric evidence of future dangerousness, and not whenever future dangerousness is significant factor at sentencing). The U.S. Supreme Court's reading of *Ake* in subsequent cases has not yet suggested a broader application of *Ake's* rule. *See Tuggle v. Netherland,* 516 U.S. 10, 12, 116 S.Ct. 283, 133 L.Ed.2d 251 (1995);

*Simmons v. South Carolina,* 512 U.S. 154, 164, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality).[9] Significantly, however, it appears that, what ever the scope of the rule may prove to be, the courts are in agreement that, for an entitlement to funding to arise, there must actually be a mental health issue in the case—*i.e.,* either the government makes it an issue or the defendant makes a preliminary demonstration that his mental condition will be a relevant and significant factor at either trial or sentencing.

In the present case, we need not determine whether *Ake,* due process, or some other jurisprudential value would require public funds to secure psychiatric assistance in a specific penalty phase scenario other than that involving future dangerousness. This is so because appellant proffers no specific argument in support of his request. He has made no preliminary showing that his mental state would be a factor during either the guilt phase or penalty phase of trial, and the Commonwealth did not argue future dangerousness at sentencing. Instead, the argument is broad, *i.e.,* that in all capital cases, there is a right to such assistance in an attempt to uncover mental health mitigation. Both *Ake* and the *Miller* Concurrence, require more. For the foregoing reasons, appellant's claim regarding state-paid psychiatric fees fails.

## V. Subpoena for Police Personnel Records

▮▮ Prior to trial, appellant sought to subpoena the entire personnel files of Officers Vernouski and Painter in the hope, he says, of finding some "prior involvement with tampering with evidence or other relevant evidence of misconduct." Appellant's Brief at 28. Following a hearing, the trial court quashed appellant's subpoena *duces tecum* on grounds of irrelevance. Appellant now claims that the trial court abused its discretion when it denied him access to the personnel files. Appellant argues that this ruling deprived him of a fair opportunity to examine the officers' truthfulness. Appellant cites *Commonwealth v. Mejia–Arias,* 734 A.2d 870 (Pa.Su-

---

9. We have confined our survey to federal circuit courts because they are representative of the approaches taken.

per.1999), and argues that because he was questioning the truthfulness of the two officers, any allegations that the officers had fabricated, lied, or perjured themselves in the past would be relevant. Appellant argues that, at the very least, the trial court should have conducted an *in camera* review of the officers' personnel files.

The Commonwealth responds that appellant did not articulate any reasonable basis to support his request at trial, and had nothing more than a "blind hope" that inspection of the records would unveil some piece of information that would aid appellant's defense. Additionally, the Commonwealth notes the strong public interest in protecting the privacy and safety of law enforcement personnel and asserts that requests for such information must be narrowly tailored to target only relevant evidence.

While not binding on this Court, the Superior Court panel opinion in *Mejia–Arias* provides useful guidance with which to evaluate this claim. The panel there opined that, to be permitted to obtain the personnel records of police officers, a defendant must first articulate a reasonable basis for his request; a criminal defendant is not entitled to a "wholesale inspection" of investigatory files. 734 A.2d at 876; *see also Commonwealth v. Herrick*, 442 Pa.Super. 412, 660 A.2d 51, 61 (1995) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 59–60, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (defendant does not have right to unfettered access to files not in his possession and cannot "search untrammeled through Commonwealth files in order to argue the relevance of materials found therein")). As for *in camera* review, this Court has held that a defendant is entitled to court inspection of investigatory files only where there is an articulable reason to believe that inspection would lead to the discovery of some relevant evidence. *See Commonwealth v. Gartner*, 475 Pa. 512, 381 A.2d 114, 120 (1977).

Appellant's unfounded speculation concerning Officers Vernouski and Painter is not a reasonable basis that would justify inspection, either by appellant or by the court *in camera.* Appellant presented no evidence that such an inspection would lead to any relevant evidence. In contrast, the defendant in

*Mejia–Arias,* the case upon which appellant relies, articulated a reasonable basis justifying inspection because the officers who were to testify against the defendant were recently suspected of lying in connection with prior search warrants. *Mejia–Arias,* 734 A.2d at 872–73.

Appellant's motion sought nothing more than a "wholesale inspection" of personnel files, which should certainly require a greater showing of basis and necessity than simply unsupported speculation concerning investigatory files pertaining to a defendant's prosecution. Furthermore, as the Commonwealth notes, the strong public interest in protecting the privacy and safety of law enforcement officers requires a narrowly targeted and supported request for relevant documents. A defendant has no right to obtain or review personnel records in the mere hope that he might uncover some collateral information with which to challenge the credibility of a police officer. Consequently, appellant's claim that the trial court abused its discretion in rejecting his request for access to the officers' personnel files lacks merit.

## VI. Recusal

Finally, appellant claims that the trial court erred in denying his motion for recusal. Appellant asserts that the trial judge, the Honorable John F. Cherry, was not impartial and could not fairly conduct appellant's trial because he had signed documents related to appellant's divorce proceedings, and because Judge Cherry was a member of the Dauphin County Prison Board when appellant filed a suit against the prison.[10]

The Commonwealth responds that appellant failed to explain how either issue compromised the trial judge's ability to be fair and impartial. Additionally, the Commonwealth notes that the trial judge did not believe either of the two grounds raised by appellant compromised his ability to be fair and impartial and that Judge Cherry's conduct throughout the pretrial and trial proceedings demonstrated that fact.

10. Neither appellant nor the trial court provide the dates of these alleged previous "interactions."

"[A] trial judge should recuse himself whenever he has any doubt as to his ability to preside impartially in a criminal case or whenever he believes his impartiality can be reasonably questioned." *Commonwealth v. Goodman,* 454 Pa. 358, 311 A.2d 652, 654 (1973). It is presumed that the judge has the ability to determine whether he will be able to rule impartially and without prejudice, and his assessment is personal, unreviewable, and final. *Commonwealth v. Druce,* 577 Pa. 581, 848 A.2d 104, 108 (2004). "Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overturned on appeal but for an abuse of discretion." *Commonwealth v. Abu–Jamal,* 553 Pa. 485, 720 A.2d 79, 89 (1998). The trial court determined that recusal was unwarranted for many of the same reasons articulated by the Commonwealth. The trial court, in its discretion, did not believe that its judgment would be clouded by the peripheral issues raised by appellant.

Neither of the two grounds for recusal raised by appellant could lead a reasonable person to question the trial judge's impartiality. The record reveals that Judge Cherry was, in fact, fair and impartial, and indeed, that he demonstrated a great deal of patience when interacting with the *pro se* appellant. Like the claim regarding the police officers' personnel files, this claim appears to be related to the vague and ill-conceived allegation on appellant's part that there was a conspiracy against him, which he repeatedly made throughout trial. Because both instances raised by appellant are too remote, peripheral, and impersonal to warrant a conclusion that the trial judge was other than fair and impartial, appellant's claim that the trial court abused its discretion fails.

## VII. Statutory Review

Having reviewed all of appellant's claims, we conclude that relief is not warranted. Accordingly, this Court must affirm the sentence of death unless we determine that it was a product of passion, prejudice, or any other arbitrary factor. 42 Pa.C.S. § 9711(h)(3)(i). After careful review of the trial record, we conclude that the sentence of death was not a

product of passion, prejudice, or any other arbitrary factor, but was based upon the evidence admitted at trial. Further, this sentence complies with 42 Pa.C.S. § 9711(c)(1)(iv), which mandates a sentence of death when the factfinder finds one or more aggravating circumstances that outweigh any mitigating circumstances. Lastly, pursuant to 42 Pa.C.S. § 9711(h)(3)(ii), we find that the evidence was sufficient to support the aggravating circumstances the jury found in imposing a sentence of death.

Accordingly, we affirm the verdicts and the sentence of death.[11]

Former Justice NEWMAN did not participate in the consideration or decision of this case.

Former Chief Justice CAPPY and former Justice BALDWIN did not participate in the decision of this case.

Justice EAKIN joins the opinion.

Justice SAYLOR files a concurring opinion in which Justice BAER joins.

Justice SAYLOR, concurring.

I join Parts I, II, III, V, VI, and VII of the majority opinion. With regard to Appellant's claim that the common pleas court erred by denying funds to retain expert psychiatric assistance (Part IV), I would remand for a fuller explanation concerning the reasons supporting the denial, but for Appellant's indication at the sentencing hearing that he did not wish to pursue the matter further. In my view, the circumstances of Appellant's offenses themselves implicate the possibility that mental and/or emotional issues may have been relevant to sentencing. The trial court's explanation for the denial of funding, however, as set forth in its Rule 1925 opinion, goes only to the issue of constitutional entitlement to funds, not to the discretionary

11. The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).

authority to allocate them.[1] Further, in terms of reasoning, the motions judge's order suggests at most a concern pertaining to the appropriate source of funding, as between the court's budget and that of the public defender. Since I do not believe that decisions concerning funding for the development of defenses to the imposition of the death penalty should turn on budgetary disputes, some further explanation would be beneficial.

Nevertheless, at trial, Appellant's standby counsel attempted to put the funding issue before the trial judge at the outset of the penalty hearing, when the court could have taken measures to address it if warranted, such as by allocating funds and granting a continuance to secure an examination.[2] Representing himself, however, Appellant stated that he wished to withdraw the motion and asked the trial court to move on. In these circumstances, I agree with the Commonwealth's position that the claim, at this juncture, is appropriately treated as unpreserved for our review.

Justice BAER joins this concurring opinion.

---

1. I have previously expressed difficulty with the reasoning supporting the prevailing constitutional interpretation of this Court. *See, e.g., Commonwealth v. Miller,* 560 Pa. 500, 524–25, 746 A.2d 592, 605 (2000) (Saylor, J., concurring). While I recognize that I am bound by the precedent concerning the constitutional dynamic, I do not read the constitutional decisions as foreclosing all review of the discretionary aspect of funding decisions pertaining to indigent capital defendants.

2. Although the motions judge's position may have remained controlling, the trial judge had the benefit of observing Appellant's behavior throughout trial, and therefore, it is possible that a different decision might have been appropriate, in light of new circumstances. In my view, the salient fact is that the trial judge was never required to make this decision, on account of Appellant's decision to forego the issue.