J-A26006-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANTHONY L. LACASTRO, JR. | : | |
| | : | |
| Appellant | : | No. 688 WDA 2019 |

Appeal from the Judgment of Sentence Entered April 3, 2019
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0000746-2018

BEFORE:  SHOGAN, J., LAZARUS, J., and OLSON, J.

MEMORANDUM BY SHOGAN, J.:                    **FILED NOVEMBER 14, 2019**

Appellant, Anthony L. LaCastro, Jr., appeals from the April 3, 2019 judgment of sentence following his conviction by a jury of five counts each of attempted first degree murder; aggravated assault; serious bodily injury; recklessly endangering another person ("REAP"); and one count of possession of an instrument of crime ("PIC").[1]  We affirm.

Appellant and his wife, Ruth Ann LaCastro ("Wife"), attended church and a party on the evening of January 6, 2018.  N.T. (Jury Trial Day 3), 1/16/19, at 91.  Appellant, who wears a holster with a licensed handgun "all the time," was drinking, and Wife was not.  *Id.* at 91–92, 100.  Wife testified that

---

[1]  18 Pa.C.S. §§ 901 and 2502(a), 2702(a)(1), 2705, 907(a), respectively. Appellant was acquitted of five counts each of attempted murder of a law enforcement officer, 18 Pa.C.S. § 2507, and aggravated assault of an officer, 18 Pa.C.S. § 2702(a)(2).

Appellant "gets belligerent and stubborn" when he drinks, and "you can't talk to him." *Id.* at 93. While at the party, Appellant fell and hit his head and was bleeding. *Id.* at 94. As they left, Appellant and Wife argued about going to the hospital and who would drive; Appellant refused to allow Wife to drive. *Id.* at 94. On the way home, it was "very slippery," and Appellant "was weaving on the street." *Id.*

Once home, Wife went upstairs and Appellant stayed downstairs. When Wife went to check on him, Appellant was "passed out on his desk" in the garage. N.T. (Jury Trial Day 3), 1/16/19, at 95, 98. Wife shook him, and he "said he was fine." *Id.* at 98. Wife went back upstairs but returned to the garage a few minutes later to check on Appellant again. *Id.* at 99. As Wife entered the garage, Appellant twice fired his handgun that had been in the holster on his belt "randomly," not in Wife's direction. *Id.* at 101. Wife stated Appellant passed out again but awoke as Wife pried the gun from Appellant's hand. *Id.* at 101. Wife left the garage and hid the gun in a clothes hamper in the house. Wife called 911. *Id.* at 102.

Wife stated that she called 911 to get an ambulance for Appellant. N.T. (Jury Trial Day 3), 1/16/19, at 102. Appellant was angry because he did not want to go to the hospital, and he told Wife, "[I'm] going to shoot anybody that comes down the driveway, because this is my house and my property." *Id.* at 104. Wife also stated Appellant said, "I hate everybody. I'm shooting everybody." *Id.* at 106. Wife testified that she returned downstairs to find

- 2 -

that Appellant "got the rifle out of the gun safe." *Id.* at 108. He was "getting the gun ready," and "[p]utting bullets in it, and stuff like that." *Id.* at 110. Wife characterized Appellant as "very upset and agitated." *Id.* at 111. Wife explained that she then told Appellant she would call back and cancel the ambulance. Appellant replied, "[I]t's too late. And he walked out the door outside." *Id.* at 103. Wife initially went outside as well. Wife testified, "I went outside because I just wanted to watch him, check on him, and see what he was going to do. And I assumed that when I went back into the house he would follow me back into the house—. . . but he didn't." *Id.* at 112.

Testimony at trial confirmed that Wife first called 911 on January 7, 2018, at approximately 1:00 a.m., and the call center referred the call to Pennsylvania State Police Communications Officer ("PCO") Richard Schau. N.T. (Jury Trial Day 2), 1/15/19, at 11–12. PCO Schau explained that the 911 call center refers calls for the state police to the barracks in Erie, Pennsylvania, where he works. Based upon that call, as well as follow-up calls, which were played at trial and for which the jurors were given transcripts,[2] the dispatch center broadcast that there was a domestic dispute at Appellant's home. In the 1:09 a.m. call, Wife indicated Appellant was "passed out on the garage floor," and she "got the pistol away from him . . . ." *Id.* at 17. During the 1:14 a.m. call, Wife indicated Appellant "had regained consciousness . . . and

_____

[2] The transcripts of the 911 calls, marked Commonwealth Exhibits 1 and 1A, were admitted into evidence N.T. (Jury Trial Day 2), 1/15/19, at 10.

he had obtained another firearm." *Id.* at 14. At approximately 1:19 a.m., a neighbor called 911 stating that he or she "heard six gunshots at that time." *Id.* at 18. Wife, as well, reported hearing those gunshots. *Id.* at 19. All of this information was relayed to police responding to the incident. *Id.* at 11, 13, 14, 18.

PCO Schau was on the telephone with Wife again at 1:23 a.m. when he heard five gunshots fired at 1:24 a.m. The recording of the call played at trial confirmed the number of shots. N.T. (Jury Trial Day 2), 1/15/19, at 21–23. The Computer Aided Dispatch ("CAD") report generated by the state police indicated that the state troopers returned fire twenty seconds later at approximately 1:25 a.m. *Id.* at 23. The 911 recordings also confirmed Wife's statement to PCO Schau that Appellant said he was going to shoot at police. *Id.* at 25.

Pennsylvania State Trooper Kyle J. Callahan testified he was working overnight on January 6–7, 2018, with his partner, Trooper (now Corporal) Cody J. Williams, when they were dispatched to Appellant's home for a domestic dispute. N.T. (Jury Trial Day 2), 1/15/19, at 28–29. Trooper Callahan carried a "Bushmaster AR-15," and Trooper Williams carried a "department-issued SIG-SAUER handgun." *Id.* at 38. Corporal Dan Moore, the patrol shift supervisor that evening, and Troopers Jake Goga and Kevin Geibel also were dispatched to Appellant's home. *Id.* at 31. While en route, the officers received information that Appellant "had pulled out a

firearm and shot two rounds in the garage area." *Id.* at 29. They then were advised that Appellant "had passed out and the gun was taken away from his person and hidden somewhere in the residence." *Id.* at 30. The next radio dispatch stated that Appellant was outside dressed in a red sweatshirt and black pants, possessed a "high powered military-style rifle," knew police were en route, and "he was going to shoot at police upon . . . arrival." *Id.* at 30–31. The officers also knew that a neighbor had called and "could hear shots being fired" before police arrived. *Id.* at 32.

As the five troopers approached Appellant's house, they saw him facing the pedestrian door of the garage with his "rifle on his shoulder, . . . yelling into the house, you could tell he sounded angry." N.T. (Jury Trial Day 2), 1/15/19, at 39. Trooper Callahan yelled, "[S]tate trooper, put the gun down, let me see your hands" multiple times. *Id.* Trooper Callahan testified that Appellant "instantly turned toward me and squared up with me." *Id.* at 40. The officer stated, "[I]n those split seconds which I call a slowdown in my life, [Appellant] instantly brought the gun up, swept over, and he said, f— you, motherf—, and multiple rounds came down the range towards us." *Id.* at 43. Trooper Callahan stated, "I took my first shot as soon as I saw the barrel of the gun come up." *Id.* He continued, "I stood up from my crouched position, took a deep breath, and I took my second shot as I was looking through my scope[,] and I observed [Appellant] fall to the ground once I took my second shot." *Id.*

Trooper Williams testified similarly. He heard the shots Appellant fired at police. N.T. (Jury Trial Day 2), 1/15/19, at 90–91. When Appellant squared his body "as if taking a shooting stance" and brought his gun up, Trooper Williams "got into a tactical maneuver down on one knee[,] and . . . fired [his] first round." *Id.* at 89. He confirmed that he has "a SIG pistol . . . which is a .45 Caliber." *Id.* Trooper Williams stated that he fired twice. *Id.*

Trooper Goga, who had an "AR-15 rifle, department issued, and Trooper Geibel, who had a "12 gauge shotgun," heard gunfire coming in their direction. N.T. (Jury Trial Day 2), 1/15/19, at 115, 130, 142. Trooper Goga remarked, "Kevin, we're getting shot at, we're taking fire at this time." *Id.* at 115. The troopers exited their vehicle. Trooper Geibel yelled, "[D]rop your weapon or drop the gun," and Trooper Goga observed Appellant yell, "F—you, mother—, and he lifted the rifle up in his right hand, his left hand came around, and the gunfire was exchanged between the troopers and [Appellant]." *Id.* at 118, 142. Trooper Goga fired his weapon from the road three times. *Id.* at 123 135. Trooper Geibel could not see Appellant, but heard the gunfire coming toward police. *Id.* at 142. All officers testified that gunfire coming toward a person sounds differently "than your typical gunfire," like a "snap whenever it's coming towards you." *Id.* at 90–91, 103, 142, 163, 173–174. Corporal Moore, who had a "SIG 45 ACP, department-issued weapon," testified hearing "snaps like we were being shot at." He stated:

> In my experience in both law enforcement and in my life I grew
> up around guns and everything, a weapon makes a very distinct

- 6 -

sound when the muzzle is pointed in your direction, it's very different than being behind the weapon when it fires. It's basically the sound of the projectile going past, you hear it. It's a very distinct sound, not something that you forget.

*Id.* at 164. Appellant was shot in the abdomen, and was taken to the hospital by ambulance. *Id.* at 96.

Corporal Victoria Wiebel processed the crime scene to collect the evidence as well as photograph the crime scene at approximately 3:40 a.m. N.T. (Jury Trial Day 2), 1/15/19, at 179, 184. Corporal Wiebel outlined her practice for capturing photographs and collecting evidence. *Id.* at 185–191. Corporal Wiebel testified she located two .45 caliber spent shell casings consistent with Trooper Williams's location and two shell casings consistent with Trooper Callahan's location. *Id.* at 192. Corporal Wiebel further described the locations of spent casings in front of the pedestrian door of the garage. *Id.* at 195.

Pennsylvania State Police Corporal Dale Wimer testified as an expert firearm and toolmark examiner. N.T. (Jury Trial Day 3), 1/16/19, at 34. He "examine[s] bullets, cartridge cases, and shot shell[s] to determine if they may have been discharged from or within the questioned firearm." *Id.* at 34. Corporal Wimer "can provide investigators with a list of possible firearms that a discharged bullet was discharged from." *Id.* Instantly, Corporal Wimer testified which discharged rounds corresponded with which firearms. He evaluated the shell casings and determined that eight casings at the north end of the driveway in front of the pedestrian door were from Appellant's rifle. A

ninth casing was inconclusive but was excluded from being fired from any of the other rifles on the scene. *Id.* at 47.

Corporal Wimer further testified that the two spent .45 caliber shell casings were discharged from the Sig-Sauer, possessed only by Trooper Wiliams on scene. N.T. (Jury Trial Day 3), 1/16/19, at 52. Corporal Wimer determined that the three discharged casings found near Trooper Goga were from his rifle. *Id.* at 53–54. Corporal Wimer concluded that it was inconclusive whether the shell casings found at Trooper Callahan's location were fired from Trooper Callahan's rifle, but Corporal Wimer excluded all of the other rifles on scene. *Id.* at 55–56.

Appellant was tried and convicted of the charges described *supra* on January 18, 2019. He was sentenced on April 3, 2019, to an aggregate term of imprisonment of 103 to 288 months. Appellant filed a timely notice of appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following single issue on appeal:

I.    Whether the evidence introduced at trial and all reasonable inferences derived from the evidentiary record, viewed in the light most favorable to the Commonwealth as verdict winner, is insufficient to establish all elements of attempted murder beyond a reasonable doubt?

Appellant's Brief at 6.

Our standard of review when considering a challenge to the sufficiency of the evidence is well settled:

A claim challenging the sufficiency of the evidence presents a question of law. We must

- 8 -

determine "whether the evidence is sufficient to prove every element of the crime beyond a reasonable doubt." We "must view evidence in the light most favorable to the Commonwealth as the verdict winner, and accept as true all evidence and all reasonable inferences therefrom upon which, if believed, the fact finder properly could have based its verdict."

Our Supreme Court has instructed: The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

In addition, "the Commonwealth may sustain its burden by means of wholly circumstantial evidence, and we must evaluate the entire trial record and consider all evidence received against the defendant."

**Commonwealth v. Green**, 203 A.3d 250, 253 (Pa. Super. 2019) (quoting

**Commonwealth v. Orie**, 88 A.3d 983, 1013–1014 (Pa. Super. 2014)

(citation omitted)), *appeal denied*, 2019 WL 3421934, 54 WAL 2019 (Pa. July

30, 2019).

Under the Crimes Code, "[a] person commits an attempt when with

intent to commit a specific crime, he does any act which constitutes a

substantial step towards the commission of the crime." 18 Pa.C.S. § 901(a).

"A conviction for attempted murder requires the Commonwealth to prove

beyond a reasonable doubt that the defendant had the specific intent to kill

- 9 -

and took a substantial step towards that goal." ***Commonwealth v. Blakeney***, 946 A.2d 645, 652 (Pa. 2008); 18 Pa.C.S. §§ 901, 2502. "The Commonwealth may prove that a killing was intentional solely through circumstantial evidence." ***Id.*** at 651.

The gist of Appellant's claim, and the only basis for the issue asserted in the Pa.R.A.P. 1925(b) statement, is that Appellant could not have been convicted of five counts of attempted murder for five different Pennsylvania State Troopers because he claims he fired only two shots in the direction of five officers. Appellant's Brief at 22, 33. Appellant maintains there were only two discharged .223 caliber shell casings from his AR-15 rifle. Appellant's Brief at 36. He contends that state-trooper testimony established that two shots were fired. ***Id.*** He argues that these were the only shots fired in the direction of the officers. Appellant discounts the seven bullet holes in the garage and the seven discharged .223 caliber shell casings located "at tent markers eight[] through fourteen[]" that were located on the south side of the garage. ***Id.*** at 37. Appellant also suggests that the testimony of Trooper Goga and Corporal Moore was contradictory and/or unreliable. Appellant's Brief at 38, 43–44.

The Commonwealth maintains that Appellant possessed the intent to kill and took a substantial step toward killing five troopers when he opened fire on them in his driveway. Commonwealth's Brief at 17. The Commonwealth underscores Corporal Weibel's testimony that Appellant's AR-15 ejected spent

shell casings from the right side of the rifle. The seven shell casings recovered and the trails made in the snow after the casings hit the ground were consistent with their being ejected from the AR-15 to the right when the rifle was pointed down the driveway southward toward the troopers. Commonwealth's Brief at 18–19.

The Commonwealth also counters Appellant's claim that there must be a numerical correlation between the number of shots fired and the number of convictions by referencing ***Commonwealth v. Jackson***, 955 A.2d 441 (Pa. Super. 2008), that there need not be a single shot fired in order for a substantial step toward the attempted homicide to exist. Commonwealth's Brief at 20; ***Jackson***, 955 A.2d at 442–443.

In conclusory fashion, the trial court determined that the evidence was sufficient to support the verdicts. Trial Court Opinion, 6/6/19, at 2. We agree with the trial court and the Commonwealth that the Commonwealth presented sufficient evidence to support the jury's verdict. Appellant acknowledges that Pennsylvania case law clearly establishes that a conviction for attempted murder is proper where a defendant shoots a gun at or in the direction of an intended victim. ***See***, ***e.g.***, ***Commonwealth v. Cross***, 331 A.2d 813 (Pa. Super. 1974), ***Commonwealth v. Jones***, 629 A.2d 133 (Pa. Super. 1993), ***Commonwealth v. Predmore***, 199 A.3d 925 (Pa. Super. 1017). Appellant's Brief at 33 n.3. He also acknowledges that a fact-finder can infer a specific intent to kill from gunshots that missed their targets. ***See***, ***e.g.***, ***Jones***, 629

A.2d at 135 n.2; *Commonwealth v. Harris*, 169 A.2d 576, 578 (Pa. Super. 1961). Appellant's Brief at 34.

Moreover, Corporal Weibel's testimony regarding her collection of evidence at the crime scene discounts Appellant's claim of insufficient evidence. Corporal Weibel testified that she placed "evidence tents," which are "numbered plastic markers that have some portions of scale . . . to show some evidence or depictions of how various things are sized." N.T. (Jury Trial Day 2), 1/15/19, at 186. Corporal Weibel recovered Appellant's AR-15 rifle inside the garage, which is where troopers had placed it after removing it from Appellant's hand. *Id.* at 199. Appellant's rifle had two magazines held in place by a coupler, which functions as follows: "[it] just holds the two magazines in place so once you have fired through whatever ammunition is in one, you can actually just eject it and move it and re-insert immediately with a fresh magazine, fresh ammunition." *Id.* at 202–203. She testified that one of the magazines "was empty, the other still had live, undischarged rounds." *Id.* Corporal Weibel also recovered Appellant's handgun from the laundry hamper where Wife had hidden it. *Id.* at 204; N.T. (Jury Trial Day 3), 1/16/19, at 105–106. Also, as noted *supra*, Corporal Wimer testified that eight of the nine discharged cartridge cases were from Appellant's rifle, and a ninth was inconclusive from that rifle, but was not discharged from any other semiautomatic rifle at the scene. N.T. (Jury Trial Day 3), 1/16/19, at 47.

Appellant's shots toward police under the facts of this case prove a substantial step toward the killing of police. There were eight spent rounds from Appellant's rifle as he stood in his driveway. N.T. (Jury Trial Day 3), 1/16/19, at 47. All of the officers at the scene testified to hearing the distinctive snap of bullets fired **toward** them. N.T. (Jury Trial Day 2), 1/15/19, at 44, 71, 90–91, 103, 142, 163, 173–174. Photographs admitted at trial substantiated the troopers' testimony regarding shots fired at them. *Id.* at 210, 220–221. During the 911 call, Wife revealed that Appellant said he would shoot anyone who came to his house, and she testified similarly at trial. N.T. (Jury Trial Day 3), 1/16/19, at 102, 104. Wife also stated that Appellant said, "I hate everybody. I'm shooting everybody." *Id.* at 106. Based on the totality of the circumstances, we conclude that the evidence was sufficient to establish beyond a reasonable doubt that Appellant possessed the intent to kill and took a substantial step toward killing the troopers when he opened fire on them.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/14/2019