J-A19038-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| TARENCE LAMAR REED | : | |
| | : | |
| Appellant | : | No. 1129 MDA 2021 |

Appeal from the Judgment of Sentence Entered November 2, 2017
In the Court of Common Pleas of Franklin County Criminal Division at
No(s): CP-28-CR-0000267-2016

BEFORE: BOWES, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED: SEPTEMBER 26, 2022**

Appellant Tarence Lamar Reed appeals from the judgment of sentence entered by the Court of Common Pleas of Franklin County after Appellant was convicted of first-degree murder and related charges. After careful review, we affirm.

Appellant was charged with first-degree murder and related offenses in connection with the December 14, 2015 shooting death of Deval Green during a home invasion orchestrated by six individuals. In September 2017, Appellant and one of his-codefendants, Antoine Alphonzo Hunter, proceeded to a joint jury trial, at which the four remaining defendants testified against Appellant and Hunter as a part of their cooperation agreements. The trial court aptly summarized the factual background of this case as follows:

---

[*] Former Justice specially assigned to the Superior Court.

On Monday, December 14, 2015, at 12:51 a.m., a neighbor of 33-year-old Deval Green called 911 to report shots fired at Mr. Green's mobile home located in Guilford Township, just outside the Borough of Chambersburg. Less than a minute later, the victim's fiancé, Faith Carbaugh, called 911 to report that Mr. Green had been shot following a home invasion robbery. Police were on the scene almost immediately and began attempting to render aid to Mr. Green who had been shot three times. Mr. Green was transported to Chambersburg Hospital where he died of his injuries shortly thereafter.

Mr. Green had lived in the mobile home in question for around six months at the time of the murder. Also living at the residence and present at the time of the crime was Ms. Carbaugh; her son B.D., age fifteen (15) at the time of the crime; and S.G., the three (3) year-old daughter of Mr. Green and Ms. Carbaugh. Mr. Green and Ms. Carbaugh were both drug addicts and drug dealers, and they regularly sold drugs from their home. This included marijuana, which B.D. also used and sold. At the time of the crime, the three only sold marijuana at the insistence of B.D., who wanted his mother to stop using harder drugs. Ms. Carbaugh and Mr. Green stopped using heroin in October of 2015, but at the time of the crime, were both active and illegal users of crack cocaine, suboxone, methadone, and Percocets. B.D. believed that the crime occurred because the intruders incorrectly believed that Mr. Green and Ms. Carbaugh still sold harder drugs than marijuana.

Mr. Green was also a member of the Crip gang, and he went by the nickname "C" or "C-Money." Also a member of the gang was a twenty-three (23) year old man named Tyree Swindell, who was like a "little brother" to Mr. Green and went by the nickname "Blue."

Late Sunday evening, several hours before the crime, Tyree Swindell was visiting the home of co-conspirators 21-year-old Cheyenne Kline-Branche and her 21-year-old boyfriend Gerald Scarlett (also known as "Jamaica" or "Junior"). Also present in the home at the time was Appellant (also known as "Shottie"), co-Defendant Antoine Hunter (also known as "HT" or "Ocky"), and 20-year-old Damien Calloway, all of whom were associates of Kline-Branche and Scarlett. The group had been playing video games, drinking alcohol, and smoking marijuana. These six individuals conspired to rob Mr. Green because Swindell said he was a drug dealer, agreeing to split anything they took evenly

between them.  No one involved in the conspiracy knew Mr. Green except Swindell.

Kline-Branche then borrowed her mother's gold minivan and drove Appellant, Scarlett, Calloway, and Swindell to a Giant grocery store on Wayne Avenue so that Swindell could buy cigarettes and Appellant could buy duct tape for his car.  Just before 11:25 p.m., less than an hour before the crime, the gold minivan is captured on surveillance footage from the grocery store.  Surveillance footage recovered from inside the store shows Swindell and Appellant enter the store and purchase cigarettes and two rolls of duct tape. …  The co-conspirators then returned to the Kline-Branche residence and began planning their individual roles in the robbery.

Kline-Branche drove the gold minivan to Mr. Green's home.  Scarlett sat in the front passenger seat while Swindell and Calloway sat in the rear.  Appellant, Hunter, and another unknown individual followed in a red sedan.  The two vehicles arrived in the parking lot of a small warehouse next door to Mr. Green's home.  Appellant, Hunter, Calloway, Swindell, and Scarlett exited their vehicles.

Kline-Branche was armed with a purple .9 millimeter SCCY pistol which she testified remained holstered during the duration of the crime.  Kline-Branche also owned a black .40 caliber Ruger pistol which is believed to be the murder weapon, but she testified that Scarlett generally carried this weapon and that the pair considered it to belong to him.  Scarlett handed this gun to Appellant and told Appellant not to shoot or kill anybody.  Hunter was already armed with a long gun.  Calloway was not armed.  Appellant, Hunter, and Calloway covered their faces and approached the house, with the expectation that Appellant and Hunter would commit the robbery while Calloway stood as a look-out.  All three went onto the front porch of the residence.

[In Mr. Green's home, a]round an hour before the crime, Ms. Carbaugh told B.D. that Swindell would be coming over that night to purchase a gram of marijuana. … [S]hortly after midnight[,] Ms. Carbaugh began making food while Mr. Green played video games on a PlayStation gaming system in the living room.  B.D. had just gone to bed in another room and was trying to sleep.  Ms. Carbaugh and B.D. testified that they heard someone knocking on the door.  When Mr. Green answered the door, he either "lunged himself out the door" or "someone took

him by the collar and pulled him out" of the door. Either way, a scuffle then ensued on the porch between Mr. Green and Appellant.

While many individuals testified to having heard the shooting, only one individual testified to having seen the shooting. Calloway testified that during the scuffle on the porch, stating "[Appellant] left off a shot from the pistol. That's when I seen Mr. Green fall to the ground." Calloway was unsure whether Mr. Green was shot at the time, but physical evidence corroborates this testimony and seems to indicate that Mr. Green was shot in the leg at this time. Appellant entered the house while Hunter and Calloway remained outside, returning shortly thereafter with two bags of stolen items. As Calloway turned around to run back to the gold minivan, Appellant tossed him a bag of items. Calloway then heard two more shots.

This pattern of the three gunshots is corroborated by the testimony of the next-door neighbor, Cole Deardorff. Mr. Deardorff lived in the house immediately adjacent to Mr. Green and testified that he had been watching television when he heard yelling coming from Mr. Green's home. He then heard a single gunshot. At that time, Mr. Deardorff retrieved his own firearm from nearby and proceeded to Mr. Green's residence. As he was exiting his own residence, he heard two more gunshots.

Immediately following the shooting, Mr. Deardorff ran underneath the branches of several low-hanging pine trees that separated his property from Mr. Green's. He saw "two or three guys running" away from him. He encountered Ms. Carbaugh, B.D., and S.G. outside, and discovered Mr. Green lying on his side at the base of the front porch facing the skirting. Mr. Deardorff attempted to render aid to Mr. Green and found that he had a pulse but was not breathing, and Mr. Deardorff was unsure if Mr. Green was alive.

As Calloway had turned to flee at the time of the final two gunshots, he did not witness the murder. However, Corporal Andrew Thierwachter, a forensic mapping expert employed by the Pennsylvania State Police, prepared several diagrams of the house and the location of the evidence using forensic technology. Using measurements he collected at the crime scene, Corporal Thierwachter prepared a bullet trajectory analysis[.] …

Mr. Green was killed by either one or both of the two gunshots fired by Appellant while Calloway was running to the

- 4 -

van. Gunshot Wound A struck Mr. Green from behind in the middle of the base of the neck at a downward angle. This bullet injured Mr. Green's sixth cervical spine vertebrae before exiting through the front of Mr. Green's neck. Gunshot Wound B struck Mr. Green from behind in the right shoulder, also traveling at a downward angle, but drastically more downward than Gunshot Wound A. Gunshot Wound B injured a major artery and vein and the left lung before exiting through Mr. Green's chest.

After Appellant shot Mr. Green, Appellant and Hunter returned to the red sedan and Calloway to the gold minivan, and the two vehicles fled the scene.

Trial Court Opinion (T.C.O.), 10/22/21, page 8-15 (some citations omitted).

Appellant was charged with first-degree murder, second-degree murder, robbery, conspiracy to commit robbery, burglary, conspiracy to commit burglary, theft by unlawful taking, and conspiracy to commit theft by unlawful taking.

At the conclusion of the ten-day trial, the jury convicted Appellant and Hunter on all charges, with the exception of second-degree murder. On November 2, 2017, the trial court sentenced Appellant to life imprisonment without the possibility of parole for the first-degree murder conviction. On the remaining charges, the trial court imposed an aggregate sentence of 19-38 years' imprisonment to be served consecutively to the life sentence. Appellant did not file a post-sentence motion.

On Monday, December 4, 2017, Appellant filed a timely notice of appeal to this Court. However, on July 2, 2018, this Court dismissed the appeal as Appellant failed to file a brief. On October 9, 2020, Appellant filed a petition for relief pursuant to the Post-Conviction Relief Act ("PCRA"). On July 26,

2021, the PCRA court granted Appellant's PCRA petition and reinstated his right to a direct appeal *nunc pro tunc*.

On August 25, 2021, Appellant filed a timely notice of appeal and subsequently complied with the trial court's order to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

In his concise statement, Appellant raised the following issues for our review:

a. Whether the Trial Court erred in finding sufficient evidence to convict [Appellant] of 18 [Pa.C.S.A.] § 2502(a), Murder of the first degree, when the Commonwealth failed to prove that [Appellant] committed a willful, deliberate, and premeditated killing?

b. Whether the Trial Court erred in finding sufficient evidence to convict [Appellant] of 18 [Pa.C.S.A.] § 903 Conspiracy – Burglary – Overnight Accommodation, Person Present?

c. Whether the Trial Court erred in finding sufficient evidence for conviction for 18 [Pa.C.S.A.] § 3502(a)(1) Burglary – Overnight Accommodation, Person Present?

d. Whether the Trial Court erred in finding sufficient evidence for conviction of 18 [Pa.C.S.A.] § 3502(a)(1) Conspiracy – Robbery – Threat Immediate Serious Injury?

e. Whether the Trial Court erred in finding sufficient evidence to convict [Appellant] of 18 [Pa.C.S.A.] § 3501(a)(1)(ii) Conspiracy – Robbery – Threat Immediate Serious Injury?

f. Whether the Trial Court erred in finding sufficient evidence to convict [Appellant] of a second count of 18 [Pa.C.S.A.] § 3501(a)(1)(ii) Conspiracy – Robbery – Threat Immediate Serious Injury?

g. Whether the Trial Court erred in finding sufficient evidence to convict [Appellant] of a third count of 18 [Pa.C.S.A.] § 3501(a)(1)(ii) Conspiracy – Robbery – Threat Immediate Serious Injury?

h. Whether the Trial Court erred in finding sufficient evidence to convict [Appellant] of a third count of 18 [Pa.C.S.A.] § 903 Conspiracy - Theft by Unlawful Taking – Moveable Property?

i. Whether the Trial Court erred in finding sufficient evidence to convict [Appellant] of a third count of 18 [Pa.C.S.A.] § 3921(a) Theft by Unlawful Taking – Moveable Property?

j. Whether the judgment exercised in the imposition of [Appellant's] sentence of total confinement of 19-38 years beyond the life sentence imposed at Count 1 is, on its face, manifestly unreasonable as to constitute an abuse of discretion by the Trial Court?

Concise Statement, 9/16/21, at 2-3.

Before we analyze the merits of Appellant's arguments, we must address the trial court's contention that we should find several of these issues to be waived as a result of Appellant's failure to provide a concise statement with sufficient detail to allow the trial court to identify and address Appellant's specific claims of error.

In similar circumstances, our courts have held that:

Rule 1925 is a crucial component of the appellate process, which "is intended to aid trial judges in identifying and focusing upon those issues which the parties plan to raise on appeal." *Commonwealth v. Lord*, 553 Pa. 415, 719 A.2d 306, 308 (1998). "When an appellant fails adequately to identify in a concise manner the issues sought to be pursued on appeal, the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues." *In re Estate of Daubert*, 757 A.2d 962, 963 (Pa.Super. 2000). "In other words, a Concise Statement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no Concise Statement at all." *Commonwealth v. Dowling*, 778 A.2d 683, 686 (Pa.Super. 2001).

"In order to preserve a challenge to the sufficiency of the evidence on appeal, an appellant's Rule 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient." *Commonwealth v.*

- 7 -

> *Garland*, 63 A.3d 339, 344 (Pa.Super. 2013) (citing *Commonwealth v. Gibbs*, 981 A.2d 274, 281 (Pa.Super. 2009)). "Such specificity is of particular importance in cases where, as here, the appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt." *Gibbs*, 981 A.2d at 281.

*Commonwealth v. Freeman*, 128 A.3d 1231, 1248 (Pa.Super. 2015). Where a 1925(b) statement "does not specify the allegedly unproven elements[,] … the sufficiency issue is waived [on appeal]." *Commonwealth v. Williams*, 959 A.2d 1252, 1257 (Pa.Super. 2008).

In *Williams*, this Court found that Williams had waived his sufficiency challenges to four of his convictions when his court-ordered 1925(b) statement failed to articulate the specific elements of any of the crimes which he alleged had not been proven. This Court noted that the trial court "required a more detailed statement to address the basis for the sufficiency challenge" as Appellant had been convicted of multiple crimes, including first-degree murder, and that each of the crimes had numerous elements which the Commonwealth was required to prove beyond a reasonable doubt. *Id.*, 959 A.2d at 1258 n.9.[1]

---

[1] The *Williams* Court distinguished the factual circumstances presented in that case from those in *Commonwealth v. Laboy*, 594 Pa. 411, 936 A.2d 1058 (2007) in which our Supreme Court found that a panel of this Court had erred in finding the appellant had waived several of his sufficiency claims by failing to present these issues with adequate detail in his 1925(b) statement. While the facts in *Laboy* involved a "relatively straightforward drug case," the Supreme Court acknowledged that "in more complex criminal matters the common pleas court may require a more detailed statement to address the basis for a sufficiency challenge." *Id*. at 415, 936 A.2d 1060.

Similar to the facts of **Williams,** in the instant case, Appellant was tried for eight separate crimes, including a charge of first-degree murder, along with his co-defendant Hunter. Their joint trial lasted ten days and included the testimony of four of the other perpetrators of the robbery alongside fifteen other witnesses. The Commonwealth also offered specialized testimony in the area of ballistics and other investigative techniques, such that there was a significant amount of evidence to review.

Therefore, as Appellant failed to provide adequate detail in his concise statement for the sufficiency challenges in issues (b) through (i) to allow for proper review, we find these issues to be waived.

However, Appellant did offer adequate detail in his concise statement to allow the trial court to review the sufficiency of the evidence supporting his first-degree murder conviction when he asserted that "the Commonwealth failed to prove that [Appellant] committed a willful, deliberate, and premeditated killing." Concise Statement, at 2. We proceed to review the merits of that claim.

Our standard of review for a challenge to the sufficiency of the evidence is well-established:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. **Commonwealth v. Moreno**, 14 A.3d 133 (Pa.Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. **Commonwealth v. Hartzell**, 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it

- 9 -

links the accused to the crime beyond a reasonable doubt. ***Moreno***, ***supra*** at 136.

***Commonwealth v. Juray***, 275 A.3d 1037 (Pa.Super. 2022) (quoting ***Commonwealth v. Koch***, 39 A.3d 996, 1001 (Pa.Super. 2011)).

We review challenges to the sufficiency of the evidence supporting a first-degree murder conviction according to the following principles:

> In the case of first-degree murder, a person is guilty when the Commonwealth proves that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. 18 Pa.C.S. § 2502(d); ***Commonwealth v. Spotz***, 563 Pa. 269, 759 A.2d 1280, 1283 (2000). An intentional killing is a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). The Commonwealth may prove that a killing was intentional solely through circumstantial evidence. The finder of fact may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body. ***Commonwealth v. Rivera***, 565 Pa. 289, 773 A.2d 131, 135 (2001).

***Commonwealth v. Clemons***, 650 Pa. 467, 503, 200 A.3d 441, 462 (2019) (quoting ***Commonwealth v. Blakeney***, 596 Pa. 510, 946 A.2d 645, 651-52 (2008)).

While Appellant does not challenge the jury's finding that he was the individual responsible for the victim's death, Appellant claims the record is "completely devoid" of evidence that he intended to kill the victim. Rather, Appellant argues that the victim's death was the unfortunate result of a "spontaneous struggle" that occurred when the intended robbery escalated quickly. Appellant's Brief, at 10-11. We strongly disagree.

Although Appellant asserts that the trial testimony showed that he and his co-defendants only agreed to rob the victim of drugs and money and never planned to murder the victim, the record contains ample evidence that Appellant himself had the specific intent to kill the victim.

Appellant orchestrated a plan to commit a home invasion with his cohorts, several of whom were armed with firearms. Appellant and Hunter took the victim by surprise when they attacked the victim as he opened the door to his residence just after midnight.

While Appellant's cohorts had instructed him not to shoot anyone during the robbery, Appellant immediately shot the victim in his thigh upon confronting him at the door, causing the victim to fall to the floor of the porch. As the victim was unarmed and now injured, it was not likely that he posed a threat to Appellant or the success of the armed robbery.

Thereafter, Appellant entered the victim's residence, threatened the victim's family, and stole a number of items. As Appellant exited the home, he threw a bag containing the stolen items to Mr. Calloway, who had been serving as a lookout.

At that time, the victim tried to escape to avoid further conflict with Appellant. Although the victim was unarmed, injured from a bullet wound, faced away from Appellant, and posed no threat to Appellant, Appellant fired two shots at the victim from behind at a downward angle. Appellant aimed his firearm at vital parts of the victim's body as one bullet hit the back of the victim's neck and injured his one of his cervical vertebrae; the other bullet

- 11 -

punctured a major artery, vein, and his lung. The victim was unable to survive his severe internal injuries.

Based on the foregoing evidence, we agree with the trial court that the jury had sufficient evidence to find that Appellant had formed the specific intent to kill the victim. Thus, Appellant's challenge to the sufficiency of the evidence supporting his first-degree murder conviction is meritless.

Appellant also argues that the trial court abused its discretion in imposing a sentence of total confinement of 19-38 years beyond the life sentence, which Appellant believes is manifestly unreasonable. Appellant's Brief, at 14.

Appellant's challenge to the trial court's decision to impose consecutive sentences implicates the discretionary aspects of his sentence.

> Challenges to the discretionary aspects of sentencing do not entitle an appellant to an appeal as of right. Prior to reaching the merits of a discretionary sentencing issue[, w]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Commonwealth v. Manivannan*, 186 A.3d 472, 489 (Pa.Super. 2018) (quotation marks, some citations, and emphasis omitted).

As noted above, Appellant filed a timely counseled notice of appeal after sentencing but his appeal was ultimately dismissed for his failure to file a brief.

Appellant then filed a PCRA petition seeking the reinstatement of his direct appeal rights *nunc pro tunc*, claiming he had been abandoned by counsel on direct appeal. After the PCRA court granted this petition, Appellant filed another timely appeal.

However, Appellant never preserved his challenge to the trial court's discretion to impose consecutive sentences by objecting at sentencing or filing a post-sentence motion. Moreover, Appellant did not request the reinstatement of his right to file post-sentence motions *nunc pro tunc*.

Our Supreme Court has held that upon the reinstatement of direct appeal rights *nunc pro tunc*, an appellant is not automatically entitled to the reinstatement of post-sentence motions *nunc pro tunc*. **Commonwealth v. Liston**, 602 Pa. 10, 12, 977 A.2d 1089, 1090 (2009). Nevertheless, a PCRA court may reinstate a defendant's post-sentence rights *nunc pro tunc* if the defendant successfully pleads and proves he was deprived of the right to file and litigate post-sentence motions as a result of ineffective assistance of counsel. **Id**. at 20 n. 9, 977 A.2d at 1095 n. 9. **See also Commonwealth v. Fransen**, 986 A.2d 154 (Pa.Super2009) (holding PCRA petitioner was not entitled to the reinstatement of his post-sentence rights *nunc pro tunc* since he did not request that relief with PCRA court and the court did not hold an evidentiary hearing on that issue).

Accordingly, while the PCRA court granted Appellant the right to file a direct appeal *nunc pro tunc*, it did not grant him the right to file a post-sentence motion as he never requested this relief and did not assert in any

way that counsel had been ineffective in failing to file a post-sentence motion or had abandoned him at this stage of the criminal proceedings.

Thus, we must find Appellant's challenge to the discretionary aspects of his sentence to be waived as it was not properly preserved at sentencing or in a post-sentence motion.

For the foregoing reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/26/2022