J-A11044-25                    2025 PA Super 125

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ANDRES RODRIGUEZ | : | |
| | : | |
| Appellant | : | No. 864 MDA 2024 |

Appeal from the Judgment of Sentence Entered February 7, 2024
In the Court of Common Pleas of Lebanon County Criminal Division at
No(s):  CP-38-CR-0000184-2021

BEFORE:   MURRAY, J., KING, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                    **FILED: JUNE 24, 2025**

Appellant, Andres Rodriguez, appeals from the judgment of sentence entered in the Court of Common Pleas of Lebanon County after a jury convicted him on charges of Criminal Homicide (First Degree Murder)[1] and Possession of Firearm Prohibited.[2]  Herein, he raises claims based on prosecutorial misconduct during closing arguments and challenges the sufficiency and weight of the evidence.  After careful review, we affirm.

The trial court accurately sets forth the pertinent facts and procedural history:

> The evidence adduced at the Jury Trial indicated that Defendant [hereinafter "Appellant"] and the victim, Jonathan Valcourt, knew each other socially.  The two attended a party at a tattoo parlor where Valcourt was employed on Thanksgiving night in 2020.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2502.
[2] 18 Pa.C.S.A. § 6105.

Once he was there, Appellant left the party to obtain marijuana and retrieve his handgun before returning.

Appellant's friend, Jonathan Butler Arrocho, was extremely intoxicated and was knocking things about the tattoo parlor. When the party became overly boisterous due to Arrocho's conduct and the number of other attendees who were consuming alcohol, Valcourt directed that everyone should leave at approximately 2:00 a.m. [].

After Valcourt, Appellant, and Arrocho exited through a side door into the adjoining alley, Valcourt and Arrocho became involved in a heated verbal exchange, and Valcourt threw a beer bottle in Arrocho's direction. Appellant immediately pulled his handgun and fired fifteen rounds as he backed down the alley. The bullets struck Valcourt ten times and he died of his injuries.

Appellant fled in his vehicle, staying at various hotels in York County until he was apprehended by United States Marshalls approximately six weeks later.

Trial Court Opinion, 8/14/2024, at 2-3.

After a jury trial, Appellant was convicted of Criminal Homicide (First Degree Murder) and Possession of Firearm Prohibited on April 20, 2023. On January 17, 2024, he was sentenced to life imprisonment for the First-Degree Murder conviction and a consecutive term of five to ten years on the Firearms conviction. Appellant filed a Post Sentence Motion challenging the weight of the evidence. [The trial court] denied his Post Sentence Motion by Order and Opinion entered May 24, 2024. Appellant has filed an appeal of [the] denial of his Post Sentence Motion. In addition, Appellant contends that he was denied a fair trial and that [the trial court] erred in refusing his motion for a mistrial based on the District Attorney's prosecutorial misconduct during the Commonwealth's closing argument.

Trial Court Opinion, 5/24/2024, at 1-2.

Appellant's brief presents the following "Statement of Questions Involved" for this Court's review:

- 2 -

A. Whether there was prosecutorial misconduct so egregious that it prevented Appellant from having a full and fair trial where the Commonwealth stated in their closing argument that:

1. It would be "a level of injustice" as if the District Attorney's Office had never charged Appellant at all if the jury returned a verdict of only Voluntary Manslaughter, which would be " a stamp of approval . . . to [Appellant] and men like him that unprovoked gun violence isn't taken seriously";

2. It would be justice for the victim and the community and "send a message" for the jury to render a verdict for Murder of the First Degree;

3. Appellant was "evil," "cruel," cried "crocodile tears," and was a "chameleon" who changed his appearance to suit his needs; and,

4. Appellant's claim of self-defense was "garbage," and defense counsel was "blustering," "posturing," and "hot air"?

B. Whether the Trial Court erred in denying defense counsel's objection and subsequent motion for a mistrial based on prosecutorial misconduct so egregious that it prevented Appellant from having a full and fair trial where the Commonwealth stated in their closing argument that:

1. it would be "a level of injustice" as if the District Attorney's office had never charged Appellant at all if the jury returned a verdict of only Voluntary Manslaughter, which would be 'a stamp of approval . . . to [Appellant] and men like him that unprovoked gun violence isn't taken seriously";

2. It would be justice for the victim and the community and "send a message" for the jury to render a verdict of Murder of the First-Degree;

3. Appellant was "evil," "cruel," cried "crocodile tears," and was a "chameleon" who changed his appearance to suit his needs; and,

    4. Appellant's claim of self-defense was "garbage," and defense counsel was "blustering," "posturing," and "hot air"?

  C. Whether there was sufficient evidence to support the jury's verdict as to Murder of the First Degree where the Commonwealth failed to prove that Appellant acted intentionally and with premeditation to kill when he fired a gun during an argument involving the victim?

  D. Whether the Trial Court erred in denying Appellant's Post-Sentence Motion challenging the weight of the evidence where it is clear from the record that the verdict issued was rendered unreliable, tainted, questionable, and contrary to the weight of the evidence by the trial testimony of Commonwealth witness, Jahida Watts, where her testimony was replete with inconsistencies, lies, half-truths, and so contrary to her original statements to law enforcement as to render the entirety of her testimony incredible?

  E. Whether the Trial Court erred in denying Appellant's Post-Sentence Motion challenging the weight of the evidence where it is clear from the record that the verdict issued was rendered unreliable, tainted, questionable, and contrary to the weight of the evidence by the rial testimony of Commonwealth witness, Darryl Watts, where his testimony was replete with inconsistencies, lies, half-truths, and so contrary to his original statements to law enforcement as to render the entirety of his testimony incredible?

  F. Whether the Trial Court erred in denying Appellant's Post-Sentence Motion challenging the weight of the evidence where it is clear from the record that the verdict issued was rendered unreliable, tainted, questionable, and contrary to the weight of the evidence by the rial testimony of Commonwealth witness, Abigail Baez, where her testimony was replete with inconsistencies, lies, half-truths, and so contrary to her original statements to law enforcement as to render the entirety of her testimony incredible?

Brief of Appellant, at 7-9.

In Appellant's first issue, he raises a claim of prosecutorial misconduct based on remarks made during closing arguments. We review this claim for an abuse of discretion by the trial court. *Commonwealth v. Jones*, 191 A.3d 830, 835 (Pa. Super. 2018).

> [W]ith specific reference to a claim of prosecutorial misconduct in a closing statement, it is well settled that any challenged prosecutorial comment must not be viewed in isolation, but rather must be considered in the context in which it was offered. Our review of a prosecutor's comment and an allegation of prosecutorial misconduct requires us to evaluate whether a defendant received a fair trial, not a perfect trial. Thus, it is well settled that statements made by the prosecutor to the jury during closing argument will not form the basis for granting a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict. The appellate courts have recognized that not every unwise remark by an attorney amounts to misconduct or warrants the grant of a new trial. Additionally, like the defense, the prosecution is accorded reasonable latitude, may employ oratorical flair in arguing its version of the case to the jury, and may advance arguments supported by the evidence or use inferences that can reasonably be derived therefrom. Moreover, the prosecutor is permitted to fairly respond to points made in the defense's closing, and therefore, a proper examination of a prosecutor's comments in closing requires review of the arguments advanced by the defense in summation.

*Id.* at 835-36 (citation omitted). It is well-settled that defendants are entitled to a fair trial, not a perfect one. *Commonwealth v. Ragland*, 991 A.2d 336, 340 (Pa. Super. 2010) (citation omitted); *Commonwealth v. Lawrence*, 321

A.3d 989 **3 (non-precedential decision) (Pa. Super. filed May 30, 2024) [3] (citing *Ragland*).

Furthermore, to preserve a claim of prosecutorial misconduct in the context of a closing statement, the defendant must object and request a remedy. *Id.* at 836 (citing *Commonwealth v. Manley*, 985 A.2d 256 (Pa. Super. 2009)). *See also Commonwealth v. Watts*, 333 A.3d 25 (Pa. Super. filed December 9, 2024) (holding lack of a contemporaneous objection constitutes a waiver of any challenge to the prosecutor's closing remarks) (citing *Commonwealth v. Powell*, 956 A.2d 406, 423 (Pa. 2008) (providing that the "absence of a contemporaneous objection below constitutes a waiver of appellant's current claim respecting the prosecutor's closing argument"); *Commonwealth v. Butts*, 434 A.2d 1216, 1219 (Pa. 1981) (providing that the failure to object during or after summation constitutes a waiver of prosecutorial misconduct claim). Additionally, it is well-settled that "the jury is presumed to have followed the trial court's instructions." *Commonwealth v. Williams*, 863 A.2d 505, 517 (Pa. 2004) (citation omitted).

Appellant contends that the Commonwealth's closing argument improperly referenced matters extraneous to the jury's task of finding facts from the evidence and applying the law to those facts in accordance with jury instructions to arrive at a verdict. Specifically, he argues the Commonwealth

---

[3] Under Pa.R.A.P. 126(b), we may cite and rely on non-precedential decisions filed after May 1, 2019, for their persuasive value.

inappropriately urged the jury to effect "justice" with its verdict, made judicially disapproved "send a message" entreaties in asking the jury to find him guilty of murder rather than manslaughter,[4] and otherwise disparaged the defense and defense counsel's closing argument.

Considering each challenged statement individually and in the aggregate, we conclude Appellant has failed to demonstrate that the unavoidable effect of the statements prejudiced the jurors and formed in their minds a fixed bias and hostility towards Appellant that prevented them from weighing the evidence and rendering a true verdict. We address each argument in turn.

The first challenged segment of the Commonwealth's closing comprises several statements advising the jury that it was in a unique position to

---

[4] To support this claim, Appellant offers partial quotations of the prosecutorial remarks and his characterizations of each:

> Specifically, the prosecutor told that jury to obtain "justice" for the victim and the community and send a message by rendering a verdict of first degree murder and "impose the consequences for that action." (N.T. at 661). Any other verdict, the jury was informed, would drop to "a level of injustice" so low that it would be as if the District Attorney's Office had declined to charge Appellant at all. (N.T. at 652-653). Indeed, the prosecutor warned the jury that if they returned a verdict of only Voluntary Manslaughter, it would be "a stamp of approval . . . to [Appellant] and men like him that unprovoked gun violence isn't taken seriously." (N.T. at 652). Defense counsel objected to the foregoing language and requested a mistrial, which was denied. (N.T. at 663, 664-666).

Brief of Appellant, at 18-19.

administer justice for the victim, his family, and the community who collectively under the facts and relevant law would be served only by a murder conviction. It consisted of the following:

> You focus on your facts. You focus on what you know we have proven to you. And you focus on the law the Judge is about to give you. When you go upstairs and deliberate, you will reach a verdict on all charges. I am confident of that. . . . And for the first time since . . . this defendant callously, intentionally, and coldly picked up a 32-round handgun at a birthday part[y] and killed a man, you get to impose the consequence for that action. You finally get to declare him not innocent, but guilty. And I'm going to ask you to hold to that oath, and to render the one and true and just outcome in this case. I am going to ask you to get justice for the Valcourt family, for Jonathan himself, and for our community, and I am going to ask you to return a verdict of guilty of first-degree murder."

N.T. at 661. The prosecutor also advocated for a just verdict by stating, "Ladies and Gentlemen, to find 15 shots at one human being, to find ten rounds penetrating his body, to label that as manslaughter, that is essentially the level of injustice as if we never would have charged this case at all." N.T. at 652.[5]

_____

[5] This excerpt is the beginning of a larger passage in which the prosecutor segues to a second, related point that we address, *infra*, namely, that to arrive at a murder verdict under the facts is the only just verdict that would tell the defendant and men like him that gun violence is taken seriously in Lebanon County. The full passage reads:

> Ladies and Gentlemen, to find 15 shots at one human being, to find ten rounds penetrating his body, to label that as manslaughter, that is essentially the level of injustice as if we never would have charged this case at all. That's what it is. Fifteen rounds, ten gunshot wounds. To say this isn't murder is

*(Footnote Continued Next Page)*

Notably absent from these challenged remarks is the judicially disfavored phrase, "send a message," the operative words at issue in ***Commonwealth v. Patton***, 985 A.2d 1283 (Pa. 2009), discussed *infra*, nor do the remarks ask the jury to render a verdict for any reason detached from the evidence presented at trial. Instead, the call for justice in the name of the victim, his family, and the community urged the jurors to consider the facts, the law, and their oaths—the latter of which defense counsel recited during his closing[6]—to impose just consequences by returning a verdict of guilty on a murder charge.

Neither the jury instructions nor the jurors' oaths were foiled by the Commonwealth's narrative stating that justice demanded a murder conviction based on evidence of Appellant's extreme and disproportional act of violence inflicted against an unarmed Jonathan Valcourt at a birthday party. The lack of either a serious provocation or threat of violence made by the victim or anyone else, the prosecutor maintained, meant that Appellant's act of firing 15 rounds at the victim could not be attributed to either the heat of passion or a sincerely held but unreasonable belief that doing so was necessary to

---

> telling the Defendant and men like him that unprovoked gun violence like this, we don't take it seriously. It's a stamp of approval. So, when you fill out this verdict slip and you consider murder versus manslaughter and those two kinds, you cast it aside and you write not guilty. You follow your oath.

N.T. at 652-53.

[6] The oath expressed they would dispassionately apply the law to the facts as presented.

defend himself against serious bodily injury or death. Therefore, she offered, because the evidence did not square with the requisite elements of the lesser crime of manslaughter, a manslaughter verdict would be unjust in a case marked by evidence of Appellant's malice and intent to kill.

That the prosecutor followed this reasoning by likening a manslaughter verdict to not having filed charges at all would have been understood by the jury, in this context, to constitute oratorical flair underscoring the already articulated Commonwealth position that a murder verdict was the only appropriate option given the evidence presented at trial and law recited in jury instructions. *See Patton*, 985 A.3d at 1287 ("It is well settled a prosecutor may employ oratorical flair in arguing to the jury. Such arguments do not constitute prosecutorial misconduct when the remarks are based upon the evidence or proper inferences deduced therefrom."). Therefore, because this first challenged segment of the Commonwealth's closing statement seeking justice through a guilty verdict of murder reflected the evidence and applicable law without prejudicing the jury, we find the trial court committed no reversible error in denying the defense motion for mistrial based on such statements.

The second challenged segment of the Commonwealth's closing involves a prosecutorial statement more akin to the disfavored—though not categorically proscribed in non-capital cases such as this—"send a message" type. Specifically, Appellant takes exception to the prosecutor's remark, "To say this isn't murder is telling the defendant and men like him that unprovoked

- 10 -

gun violence like this, we don't take it seriously. It's a stamp of approval." N.T. at 653.

Prosecutorial closing statements asking a jury to "send a message" to a defendant alone, without inclusion of the community or the criminal justice system, do not invite a problematic consideration of extraneous matters and therefore are not misconduct. *Patton*, 985 A.2d 1283, 1288 (Pa. 2009). Here, however, though the statement in question began by focusing on Appellant, as the closing had done to that point, the prosecutor then added "and men like him" as intended recipients of the jury's verdict. This addition was not proper, as it expanded the scope of interest beyond Appellant to include other individuals not associated with the case before the jury.

As alluded to above, generally, "[a]n improper statement during the prosecutor's closing argument will warrant a new trial only when the unavoidable effect of the statement is to prejudice the jury against the defendant, or prevent it from weighing the evidence objectively and rendering a true verdict." *Jones*, *supra*; *Patton*, at 1287. A prosecutorial closing statement calling upon the jury to "send a message," however, requires closer scrutiny:

> [The Pennsylvania Supreme Court] has stridently condemned prosecutorial statements urging a criminal jury to "send a message" to the community or the criminal justice system. A jury is sworn to render a verdict based solely on the evidence presented; arguing extraneous reasons for a verdict misdirects the jury from that purpose. Such arguments inject irrelevant matters into the deliberation; they invite the jury to focus on matters beyond its ken.

> Portraying the community as being under an attack, a prosecutor may not ask the jury to respond to the attack with its verdict. *Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221, 237 (1995). Even when we have found such remarks to be harmless, we admonished "all parties in criminal matters before any court in the Commonwealth to refrain from such exhortation in the future." *Commonwealth v. Hall*, 549 Pa. 269, 701 A.2d 190, 203 (1997).

*Patton*, at 1287.

Specifically, our Supreme Court in *Patton* observed that when such an improper request is put to a capital case jury during penalty phase arguments it is *per se* prejudicial and grounds for mistrial. *Id.* at 1287-88. However, "[i]n non-capital cases, as juries do not weigh aggravating and mitigating circumstances, a *per se* rule is not necessary. In these less emotional cases, evaluation of these allegedly offending statements may be done on a case-by-case basis." *Id.* at 1288.

Undertaking a harmless error review, we determine that the secondary part of the "tell Appellant and men like him" commentary at issue was an isolated remark made in passing in what was otherwise an evidence-based closing argument focused on the details of Appellant's actions and explaining why they warranted a murder conviction. As such, the challenged commentary had minimal if any prejudicial effect given the strength of incriminating evidence and the emphasis the prosecutor repeatedly placed on the jury's obligation to discharge its oath by finding facts based on the evidence, applying the law to those facts, and coming to a verdict accordingly. *Id.* (acknowledging the prosecutor lessened any potential prejudice of her

remarks to send a message to an eyewitness who testified despite fear of reprisal by cautioning the jury to recall its oath to listen to facts, apply the law to the facts, and render a verdict in fulfillment of its oath to do so.) Accordingly, we find this issue merits no relief, as the prosecutorial remark in question did not cause reversible prejudice.

Appellant next challenges adverse court rulings to his objections and motion for mistrial made in response to what he says were "disparaging" characterizations of him as dishonest and of the defense as baseless. Reversible error occurred, he argues, when, over objection, the closing argument was allowed to stand after the prosecutor had referred to him as evil, insanely cruel and intentional, a chameleon who changed his appearance to suit his needs and cried crocodile tears at opportune moments during this case to curry favor and avoid due punishment, all of which was reversible error. *See* N.T. at 63-38, 654, 657, 663, and 664-666.

For its part, the Commonwealth disputes Appellant's claim that he preserved all challenges raised in this issue, as it insists that he failed to object to most of the references. The only defense objections raised during closing, the Commonwealth maintains, were to the prosecution referencing "evil" men, deeming the defense "garbage," accusing defense counsel of "blustering and posturing with hot air," and arguing that a verdict of murder would tell Appellant and men like him that gun violence is taken seriously in Lebanon County. Brief of Appellee, at 17-18. The Commonwealth posits, "Notably, Defense Counsel twice confirmed that he had no additional objections to the

District Attorney's summation, that he had expressed the full extent of his challenge and the basis for his mistrial request." Brief of Appellee, at 19.

Our independent review of the record supports the Commonwealth's position on waiver. *See* N.T., 4/20/23, at 664-666. Accordingly, we shall review Appellant's challenge to the limited extent it has been preserved.

First, the record shows defense counsel lodged an objection in chambers that "[the prosecutor] said men such as the Defendant are evil and they do this. You can't call the Defendant evil in the course of a closing argument." N.T. at 665.

The notes of testimony show the prosecutor had transitioned from discussing concepts of malice, wickedness and cruelty implicated in a charge of third-degree murder to addressing the charge of first-degree murder and specific intent. N.T. at 653-654. In making the point that specific intent may be formed "in the time it takes to snap your fingers," the prosecutor emphasized that specific intent may be formed so quickly, and "the law holds this because there are men in this world who are evil, who are cruel, but who are also very, very impulsive. Men who will bring a 32-round handgun to a birthday party with friends and family and then decide instantaneously that they want to use it. That's what the law holds." N.T. at 664.

Initially, we discern some ambiguity with the prosecutor's reference to "evil" men made as part of the larger discussion on the time it takes to form specific intent. The excerpts above may be understood to state that specific intent may be formed not only in the plans made by evil or cruel persons but

also in split-second decisions reached by "very impulsive" persons who decide to kill in an instant. The structure of the prosecutor's statement in this regard does allow the interpretation that she is instructing the jury that they need not find a defendant evil to find he has formed the specific intent to kill.

Even assuming arguendo that the prosecutor's closing, when read as a whole, posited that Appellant formed the intent to shoot the victim earlier that evening when he left the party and returned with his gun, the non-specific reference to "men in this world who are evil" was sufficiently subordinated by a continuing emphasis on the evidence-specific chronicle of how Appellant's actions leading up to and including the unprovoked, extreme shooting of the victim satisfied each element of the charge of first-degree murder. Furthermore, the trial court appropriately instructed the jury that the arguments of counsel are not evidence, and jurors are presumed to have followed the trial court's instructions. Accordingly, we find no prejudicial effect from the prosecution's passing, broad reference to evil people in the world. *See Commonwealth v. Elliott*, 80 A.3d 415, 445 (Pa. 2013) (holding prosecutor's remarks that "this closing speech [has] become, for me, sort of a benediction for all the evil that we have been confronted with in this case" did not have unavoidable effect of prejudicing the jurors and rendering them incapable of weighing evidence and rendering a true verdict).

Appellant's next preserved challenge to the Commonwealth's closing argues that remarks calling the defense "garbage" and defense counsel's argument full of "hot air" and "bluster," warranted mistrial. The prosecutorial

passages in question stated that when the jury begins deliberations over reasonable doubt and considers the defense position that Appellant acted in heat of passion and unreasonable self-defense, it will recognize from the testimony, evidence, and the elements of the crimes that it was Appellant's specific intent to take a life, and thus "know this claim of heat of passion and unreasonable self-defense is bogus and it's garbage. . . ." N.T. at 658. Moments later, the prosecutor argued that the Commonwealth had presented evidence leading up to and including Appellant's 15 gunshots causing 10 gunshot wounds whereas the defense responded only with "blustering and posturing and hot air. . . ." N.T. at 660.

The full passages in question are as follows:

> Reasonable doubt means when you go up those stairs and you deliberate and you as a group talk about the testimony and the evidence and the elements, when you know in your heart of hearts, you know that this Defendant shot and killed with malice, you know in your heart of hearts it was his intent to take a life, his specific intent to take a life, and you know this claim of heat of passion and unreasonable self-defense is bogus and it's garbage, when you know that in your heart of hearts there's no reasonable doubt. None.

N.T. at 658.

> [From the Commonwealth] you have heard testimony and facts and you have seen evidence. There has been proof. What we tell you, we back up. And what you have seen from the Defense is blustering and posturing and hot air because when you have 15 gunshots fired, 10 gunshot wounds sustained, it's hard to combat that. I get it. But I'm going to ask you to not get distracted, do not get confused. You focus on your facts. You focus on what you know we have proven to you. And you focus on the law the Judge is about to give you.

N.T. at 660.

Appellant argues this "personal condemnation" of defense counsel impermissibly shifted focus from the evidence to counsel's credibility and in so doing was not within the bounds of permissible "oratorical flair." The Commonwealth counters that the remarks represented fair response to the defense argument that Appellant was acting in self-defense or, alternatively, on a sincerely held but unreasonable belief that deadly force was necessary to defend himself from serious bodily injury or death.

We agree the excerpt shows the prosecutor said Appellant's self-defense or imperfect self-defense defense could be characterized as consisting of "hot air," "bluster," and "posturing" when viewed against the evidence presented during trial. While the language was a somewhat deprecating form of oratorical flair, it was nonetheless offered as part of a broader discussion of the evidence in which the Commonwealth's point was clear—there was no credible defense to evidence proving Appellant intentionally fired 15 gunshots in rapid succession at the victim in response to a beer bottle having been tossed near him. Because we discern no unavoidable prejudicial effect of such commentary made in context of the entire record, we deem this challenge meritless.

The remainder of Appellant's issues argue that the jury's verdict was against the sufficiency of the evidence or, in the alternative, the weight of the evidence. We take each issue in turn.

Appellant contends there was insufficient evidence to support the jury's verdict of guilty to First Degree Murder "where the Commonwealth failed to prove that Appellant acted intentionally and with premeditation to kill when he fired a gun during an argument involving the victim." Brief of Appellant, at 32. We disagree.

> Our applicable standard of review is whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict-winner, was sufficient to enable the fact-finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt. Additionally, when examining sufficiency issues, we bear in mind that: the Commonwealth's burden may be sustained by means of wholly circumstantial evidence; the entire trial record is evaluated and all evidence received against the defendant considered; and the trier of fact is free to believe all, part, or none of the evidence when evaluating witness credibility.
>
> This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Although a conviction must be based on more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty.

*Commonwealth v. Dewald*, 317 A.3d 1020, 1038 (Pa. Super. 2024) (internal citations, quotations, brackets, and indentation omitted).

Murder of the first degree is an intentional killing. *See* 18 Pa.C.S.A. § 2502(a). The Crimes Code defines "intentional killing" as a "willful, deliberate and premeditated killing" of another person. *Id.* at § 2502(d). To sustain a conviction for first-degree murder, the Commonwealth must prove beyond a reasonable doubt that: (1) a human being was unlawfully killed; (2) the

- 18 -

defendant, in fact, did the killing; (3) the defendant acted with a specific intent to kill; and (4) the killing was done with premeditation and deliberation. *Commonwealth v. Simmons*, 662 A.2d 621, 627-28 (Pa. 1995); *see also Commonwealth v. Counterman*, 719 A.2d 284, 292 (Pa. 1998) (stating "no particular period of premeditation is required to form the requisite intent"). The Commonwealth may prove the specific intent to kill "solely through circumstantial evidence." *Commonwealth v. Blakeney*, 946 A.2d 645, 652 (Pa. 2008).

Relevant in the present case is the precept that "[a] jury may infer the specific intent to kill based upon the defendant's use of a deadly weapon on a vital part of the victim's body." *Id.* (internal citation omitted). The specific intent to kill can be formed in a "fraction of a second." *Commonwealth v. Clemons*, 200 A.3d 441, 462 (Pa. 2019). *See also Commonwealth v. Rivera*, 773 A.2d 131, 136-37 (Pa. Super 2001) (concluding the evidence was sufficient to establish deliberation and specific intent to kill where the defendant shot his victim four times, and each shot required a pull of the trigger).

Appellant argues the evidence was insufficient to establish that he acted intentionally and with premeditation to kill Jonathan Valcourt because, he claims, "there was no evidence of any preexisting animosity between the men that could fuel a finding of ill will or malice. To the contrary, all testimony presented established appellant Rodriguez and Mr. Valcourt were good,

longtime friends." Brief of Appellant at 35. Moreover, he relies on evidence that showed he was backing away while shooting as additional proof he acted not with malice and specific intent to kill but in self-defense while attempting to retreat from and avoid the incident. Brief of Appellant at 36. Neither point is persuasive.

The trial court addressed this issue in its Rule 1925(a) opinion and determined it was devoid of merit:

> The evidence presented by the Commonwealth was sufficient to support Appellant's First-Degree Murder conviction. The witnesses testified that only Valcourt and Arrocho were involved in an argument and there was no argument between Appellant and Valcourt prior to the shooting. The evidence indicated that Appellant had left the party to retrieve his gun and had it displayed on his person throughout the evening of the party. Appellant had the gun in his hand in the alley, holding it up as he paced back and forth. After the bottle was thrown at Arrocho, Appellant aimed his gun at Valcourt and shot at him fifteen times.
>
> It was clear that Appellant's actions were willful, deliberate, and premeditated and that he had the conscious purpose of bringing about Valcourt's death. Appellant aimed his gun at the center of Valcourt's body in the area of his vital internal organs. He also shot Valcourt in the back of his head and body. Valcourt's spine was severed by a bullet. Appellant continued shooting even after he observed that Valcourt was severely injured and bleeding. Appellant fled after the shooting and remained at large until he was apprehended. Thus, all elements of this offense were proven by the evidence, including that this was an intentional killing.

Pa.R.A.P. 1925(a) Opinion, at 11-12.

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we concur with the trial court's opinion rejecting Appellant's position and finding the evidence was sufficient to establish beyond a

reasonable doubt that Appellant had the specific intent and acted with premeditation to kill Jonathan Valcourt. As noted, *supra*, malice and the specific intent to kill may be formed in a fraction of a second and may be inferred from the use of a deadly weapon upon a vital part of the victim's body. Premeditation may be established solely from circumstantial evidence. Here the jury rejected the notion that a beer bottle tossed in the vicinity of Arrocho and Appellant either sufficed as provocation or formed in Appellant's mind a sincere but unreasonable belief that his use of deadly force by gunfire was necessary to spare him from serious bodily injury or death. Having reviewed the totality of evidence, therefore, we conclude Appellant's sufficiency challenge is without merit.

Appellant's final challenge goes to the credibility of the witnesses who testified against him and the weight that should have been afforded to their testimonies. Our well-settled standard of review for a challenge to the weight of the evidence acknowledges that such a challenge concedes that there is sufficient evidence to sustain the verdict but contends, nevertheless, that the verdict is against the weight of the evidence." ***Commonwealth v. Davis***, 799 A.2d 860, 865 (Pa. Super. 2002) (citation omitted). Moreover,

> A verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. It is well established that a weight of the evidence claim is addressed to the discretion of the trial court, and a new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial court is to determine whether, notwithstanding all the evidence, certain facts

- 21 -

are so clearly of greater weight that to ignore them, or to give them equal weight with all the facts, is to deny justice.

In reviewing a challenge to the weight of the evidence, the function of an appellate court is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence. Appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose an abuse of discretion.

*Commonwealth v. Anderson*, 323 A.3d 744, 756-57 (Pa. 2024) (internal citations, quotation marks, and brackets omitted). Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citations omitted, emphasis in original).

Appellant focuses his weight of the evidence claim on the credibility of Commonwealth witnesses Jehida Watts, Darryl Watts, and Abigail Baez. He claims the testimonies of Jehida Watts and Darryl Watts were "not at all credible because the blatant craftwork behind them [was] clearly designed to eliminate any reason for Defendant Rodriguez acting out of a sudden passion, provoked by the action of Jonathan Valcourt." Brief of Appellant at 40. The testimony of Abigail Baez "bears no resemblance to all other available accounts and is therefore incredible." *Id.* at 40-41. "The contradictions and inconsistencies" in the testimonies "so undermines confidence in the jury's

verdicts that a new trial is required in the interests of justice[,]" Appellant posits. *Id.* at 41.

The trial court extensively detailed the evidence that it considered in reviewing Appellant's weight of the evidence challenge raised in his post-sentence motion. Specifically, in its opinion of May 24, 2024, denying post-trial relief, the trial court thoroughly addressed Appellant's challenges to the eyewitnesses' alleged inconsistencies, lies, and half-truths that were "so contrary to [their] original statements[:]"

**Inconsistencies in Statements and Testimony of Jehida and Darryl Watts**

Defendant complains that both Jehida and Darryl initially told the police that Victim had thrown the beer bottle at the shooter but that they changed their stories as both testified at trial that Victim threw the bottle at Arrocho. He argues that this change in stories reveals that the two had collaborated and "remanufactured" their trial testimony to fit the Commonwealth's version of the events and that "the effect of that fabrication is shocking" such that the verdict arrived at by the jury was questionable and the product of guesswork.

We do not agree with Defendant's assessment of the evidence at trial. First, we note that Darryl did not identify Defendant as the target of the beer bottle in his initial interview with the police, but only stated that he was unsure as to the intended target. Darryl had never met Arrocho prior to the night of the party and did not really know him when he was questioned by police only hours after the shooting. He indicated to police that the bottle was thrown at "some dude." He later identified the "dude" as Arrocho. N.T. 4/19/23 at 472-473. Darryl had just witnessed the death of his best friend and would have been extremely upset during his initial interview. He explained at trial that he was still in shock when he was questioned. At trial, Darryl repeatedly confirmed that the bottle was thrown at Arrocho.

- 23 -

Moreover, as pointed out by the Commonwealth, Darryl's testimony on cross-examination does not clearly indicate that Darryl had identified Defendant as the target of the beer bottle in his statement to the police.

> Q. Victim threw a bottle at somebody?
>
> A. Yeah.
>
> Q. Is it the same person that shot?  Who would be Mr. Rodriquez over there, correct?
>
> A. Correct.

N.T. 4/19/23 at 469.

In response to Defense Counsel's interjection, it appears that Darryl may have agreed  that the "same person that shot" Victim was a reference to Defendant who was sitting at counsel table in the courtroom during trial.  During this exchange, Darryl did not state that the "same person that shot" was the "somebody" at whom the beer bottle was thrown.

Although Jehida initially told police that the beer bottle was thrown at "the guy who shot," she later clarified her statement.  During her September 15, 2021 statement to the District Attorney and at trial, Jehida indicated that she heard the bottle hit the ground near Arrocho.   N.T. 4/18/23 at 103-104; Exhibit "25B" at p. 14.  Jehida's initial statement was also given only hours after she had witnessed the shooting and she explained that she did not know Arrocho before the previous evening.

Even if the statements made during the initial interviews of these two witnesses is deemed inconsistent with their latter statement and their trial testimony, we do not believe the initial statements were entitled to greater weight than the testimony given at trial.  Jehida testified that she met Defendant for the first time within a few hours prior to the shooting when she and Darryl arrived at Valcourt's home at 11:30 p.m.   Neither Jehida nor Darryl had ever met Arrocho until they arrived at the party and they were not even certain of his name.  At trial, both witnesses were adamant that Victim and Arrocho were the ones involved in the argument

and that Victim threw the bottle at Arrocho. They confirmed this several times throughout their testimony and their testimony was corroborated by Cruz. All the witnesses who were present in the alley testified to the same locations of Arrocho, Defendant, and Victim prior to the shooting. The fact that the beer bottle landed where Arrocho had been standing was also confirmed by photographs taken shortly after the shooting. Exhibit "27C." In addition, Defendant's note seeking to "get rid of" Darryl and Jehida lends credence to this evidence as he knew that their testimony would be to his detriment at trial. During his testimony, Defendant admitted that this was true.

The jury obviously resolved any perceived inconsistencies and accepted the testimony of these witnesses as credible. Under the circumstances, it does not shock our conscience that they did so. Thus, we find no reason to disturb the verdict on these grounds.

**Testimony of Abigail Baez**

Defendant claims that the testimony of Baez was "entirely incredible" because no other witness put a gun in Defendant's hand prior to the shooting and no other witness observed Defendant standing at the "mouth" of the alley. He further claims that her account of the incident is contradictory to the video footage.

We also disagree with Defendant's assessment of the evidence offered by Baez. Baez did not testify that Defendant was standing at the "mouth" of the alley. Her testimony was that she had started to pull her vehicle into the alley from Cumberland Street, but stopped in the entrance when she observed the scene. Baez could clearly see Defendant's actions as her headlights were focused on him from her unique vantage point. Due to her location, Baez noted that Defendant was standing closer to her than the others.

Moreover, Baez's testimony was corroborated by other testimony. Valcourt and Cruz both testified that they observed Defendant holding a gun in his hand prior to Victim throwing the beer bottle. Defendant himself testified that he had pulled out his gun "just in case" before the beer bottle was thrown because he felt that

things were going to get bad when Victim was able to free himself from the person who was holding him back. N.T. 4/20/23 at 539-540-566.

We also fail to see any contradiction in Baez's testimony regarding Defendant holding the gun up and the video footage from the alley. Defendant, Arrocho and Victim were off-screen for approximately 33 seconds prior to the shooting. Baez testified that she observed the scene for ten seconds before she reversed out of the alley and that she heard the gunshots immediately as she accelerated. This indicates that her observation of Defendant occurred within the 33 seconds prior to the shooting when Defendant could not be viewed by the camera. We find no contradiction merely because Baez was able to make observations which were not recorded. The fact that she was able to make additional observations of Defendant which other witnesses, and the camera, were unable to see does not undermine her credibility. The jury clearly found that her testimony was credible and worthy of consideration and, again, this does not shock our conscience.

At the jury trial, we gave instructions to the jury on third-degree murder and voluntary manslaughter. The jury was free to evaluate Defendant's claims with regard to these charges had it found any discrepancies, inconsistencies or contradictions in the Commonwealth's evidence. The jury found Defendant guilty of first-degree homicide based on the evidence presented. In light of Defendant's conduct, particularly his retrieval of his gun, his having it ready prior to Victim throwing a beer bottle, and his shooting 15 rounds at Victim and not ceasing fire until he had hit Victim 10 times and saw Victim bleeding, we believe that this verdict was warranted and see no reason to award Defendant a new trial.

For the above reasons, we will deny Defendant's Post Sentence Motion.

Trial Court Opinion, 5/24/24, at 21-26.

- 26 -

From our review of the record, we perceive no abuse of discretion in the trial court's weighing of the evidence. Therefore, we conclude Appellant's weight of the evidence claim is without merit.

For the foregoing reasons, we affirm the judgment of sentence entered below.

Judgment of sentence is affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/24/2025